J. T. West v. J. J. Terrell, Commissioner.

No. 1198. Decided May 28, 1903.

**1.—Constitutional Law—Lease—Sale.**

Question suggested whether public lands held under a valid lease, but not before made subject to sale, could be sold without reference to the rights of the lessee. (P. 555.)

**2.—Public Lands—Lease—School Fund—Sale.**

The Act of February 23, 1900, to define the permanent school fund, etc. (Gen. Laws, 1st Called Sess., 26th Leg., chap. 11, p. 29), did not, in bringing into the school fund unsurveyed lands situated in the absolute lease district and under lease, make them subject to sale without regard to the lease; by section 3 they were made subject to sale as "now provided by law for the sale of surveyed school lands," and were to be sold "on the same terms, conditions and limitations," which included the restriction that they should not be sold during the term of the lease, if situated in the absolute lease territory. (Pp. 554, 555.)

**3.—Same.**

Section 7 of the Act of February 23, 1900, determines rights of priority among applicants to purchase, but not when or how the land is to become subject to sale, and does not restrict the rights of lessees to a mere priority of right to purchase as actual settlers. (P. 555.)

**4.—Land Commissioner—Sale or Lease—Adoption of Regulations.**

The power of the Commissioner of the General Land Office to lease or sell does not depend upon the previous establishment by him of rules therefor. (P. 556.)

**5.—School Land—Lease—Advertisement.**

Under the Act of 1895 for the sale or lease of school lands it was not essential to the validity of a lease that the Commissioner should advertise for same before letting,—the requirement that he "shall" do so in section 17 of that law (Gen. Laws, 24th Leg., chap. 47, p. 69) being changed to "may" by the amendment of such section by the same Legislature. (Gen. Laws, 24th Leg., chap. 48, p. 76.) (P. 556.)

**6.—Lease—Cancellation—Mandamus.**

Allegations of petition and answer in regard to cancellation of a lease held, at most, to present a disputed question of fact as to its legal cancellation, which the Supreme Court could not determine on application for mandamus. (Pp. 556, 557.)

**7.—Same.**

As against the showing, from the mere absence of such instrument from the files, that the Land Commissioner had failed to file a "writing under his hand and seal of office" canceling a lease, as required by Rev. Stats., art. 4218v, an indorsement of its cancellation on the wrapper in the Land Office, and the fact that the parties had treated it as canceled, coupled with the presumption that the officer had done his duty, might, it seems, be sufficient to present an issue of fact. (P. 557.)

**8.—Same—Informal Cancellation.**

An informal cancellation of a lease of school land by the Commissioner, without filing the writing under seal required by Rev. Stats., art. 4218v, if acquiesced in by the lessee, could not be reopened by a third party after a lapse of some six years. (P. 557.)

**9.—Same.**

A cancellation of a lease of school land for nonpayment of rent under art. 4218v, Rev. Stats., and reletting to the same party after the expiration of sixty days from default was not invalid because the new lease was dated back to the day of default nor because the application therefor was filed before the sixty days expired. (Pp. 557, 558.)

**10.—Mandamus—Disputed Facts.**

The Supreme Court can not grant mandamus where material facts, such as an intent to evade the law, are in dispute. (P. 558.)

Original application by West to the Supreme Court for a writ of mandamus to Terrell, Commissioner of the General Land Office, making Morris, an adverse claimant, also a respondent.

*Ashby S. James* and *E. H. Yeiser,* for relator.—Relator has presented his petition for mandamus to this court, claiming that the action of the Commissioner of the General Land Office is contrary to the law and in violation of relator's rights for three several reasons, to wit:

1.   Because the lease set up by the Land Commissioner as an obstacle to this purchase is void as against the rights of the relator, an actual settler, because the same was executed before the Commissioner of the General Land Office had established any rules and regulations for the lease of the public free school land or other public lands in the State and had caused same to be approved by the Governor and promulgated for the information of the citizens of this State, and because said lease was executed without any advertisement of same and without any competitive bidding in direct violation of the law.

2.   Because, if the foregoing contention be not sustained, then said lease is now void as against the application of an actual settler to purchase said land, for the reason that when the same was executed, there was no law in force providing for the absolute lease of the unsurveyed public domain of the State, and because since the execution of the lease, the Legislature has provided for the sale of this land by the Act of May 23, 1900, and the only right which Nelson Morris can claim under this act of the Legislature placing this land on the market was a prefer-

ence right to purchase four sections as an actual settler, which right he has failed to exercise within six months after said land was surveyed and classified, and therefore has been lost.

3.   Because said lease which the Land Commissioner interposes was executed by virtue of an application by Nelson Morris filed with the Commissioner of the General Land Office while a lease in his favor already existed, and his money on said new lease was at the same time paid into the State Treasury; both of said acts being done prior to the cancellation of said former lease, thereby preventing any competition for the lease of said land and absolutely preventing same from coming on the market for sale to actual settlers, therefore said lease comes within the purview of the decision of this court in the case of Ketner v. Rogan and is void as against the rights of this relator.

Where the Legislature has enacted a law affecting the public lands of this State in which, under the terms of the law, the public have a direct interest, and has provided in express terms a certain method for the disposition of these lands, and has established certain conditions precedent under which they shall be sold and leased, so as to protect the public interest, the Commissioner of the General Land Office is without power to dispose of these lands, either by sale or lease, in any other manner, so as to affect the rights of the public generally in these lands; and where he has attempted to make a sale or a lease of any portion of these lands in any other method, and without a compliance with the terms of the law, his act is void as against other citizens exercising their right under the law to purchase said land in full compliance with the law.

All the power that any officer of this State has is given to him by the law, and any act which any officer, from the chief executive of the State to the lowest officer in it, may assume to do in excess of the power thus given, is void and can not affect the rights of the citizens of this State, which are violated by such illegal act.

Where the Commissioner of the General Land Office has conferred upon him by law certain powers and duties with reference to the sale and lease of the public free school lands of this State, any act done by him in the making of a sale or execution of a lease of such lands in excess of the powers conferred upon him by the law, and without a compliance with the terms of the law giving him these powers, is void as against the rights of the citizens of this State to purchase said lands by a full compliance with the law on their part.

All leases executed upon unsurveyed public domain, prior to the passage of any law providing for the sale and lease of such land, present no obstacle to the purchase of such land by actual settlers, after the same has been surveyed, in accordance with the law providing for its sale, and has been applied for by an actual settler in full compliance with the law.

*C. K. Bell,* Attorney-General, and *T. S. Reese,* Assistant Attorney-General, for respondent Terrell.—It is contended by relator that the lease referred to in his petition is void because the Land Commissioner had not, at the time of the execution of the same, adopted rules and regulations for carrying out the provisions for the sale and lease of public lands, and had the same approved by the Governor, in accordance with the provisions of article 4218c of the Statutes. It appears from the answer of the respondent that such regulations had never been adopted and promulgated at the date of the rejection of relator's application to purchase, and therefore, if relator's proposition is sound, there was no more authority on the part of the Land Commissioner to sell the land to him than there was to lease it to Nelson Morris. The fact is that the regulations prescribed by the statute are so full and precise that it seems never to have been considered necessary for the Land Commissioner to do more in this particular than to prescribe and prepare forms for applications to buy and lease, and other such instruments as were required to be executed, and if relator's contention is sound there has never been a legal and valid sale or lease of public school, university and asylum lands. Certainly, his argument cuts the ground from under his own feet, and leaves him no right to buy under the application filed by him.

Relator contends that the lease to Nelson Morris was void for the reason that there was no advertisement and letting upon competitive bidding. Article 4218r, under which this lease was made, provides, among other things, as follows:

"And all leases under the provisions of this chapter *may* be advertised by the Commissioner in such manner as he may think best, and let to the highest responsible bidder, in such quantities and under such regulations as he may think to the best interest of the State not inconsistent with the equities of the occupant."

It is significant that in the original Act of 1895 (Acts of the 25th Leg., p. 69), the word "may," italicized in the foregoing quotation, was not used, but in place thereof the Legislature used the word "shall." A few days after the passage of this act, an act was passed amending the former act, including section 17, in several particulars. This amending act is chap. 48, p. 75, Acts of 25th Leg. Among other changes made in the original section 17, the provisions with regard to advertising and letting of leases to the highest bidder is amended by substituting the word "may" for the word "shall."

The contention of relator that the Act of 1897 (chap. 129, Acts of 25th Leg.), establishing the absolute lease district, did not by the caption nor by the terms of the act embrace leases of "public domain" rests, we assume, upon the fact that the caption of the act, by its terms, relates "to the sale and lease of public free school lands," and that article 4218s, as amended thereby, by its terms refers to leases of "any portion of the lands belonging to any of the funds mentioned in this chapter." We are only concerned here with the terms and provisions of article 4218s of the Revised Statutes, as amended by the Act of 1897. Article

4218r of the Revised Statutes of 1895, which was not amended, fully authorized, in fact, by the use of the mandatory word "shall," required the Land Commissioner to lease "public domain." The language is, "the public lands and all lands mentioned in this chapter shall be leased by the Commissioner of the General Land Office under the provisions of this chapter at not less than three cents per acre," followed by specific directions as to price, length of term, etc. This gave the Commissioner full authority to lease public domain, and required him to do so, and gave him all necessary directions to enable him to carry out the command of the Legislature. The caption of the Act of 1895 fully covers the provisions for leasing public lands not belonging to any of the funds mentioned. It may be admitted that the provisions of article 4218s, both in the original act and in the amendment of 1897, were not intended to embrace leases of public domain as distinguished from lands belonging to the various funds mentioned. One of these provisions is, "all lands which may be leased shall be subject to sale at any time, except where otherwise provided herein." This provision, evidently, was not intended to apply to "public domain," inasmuch as no provision had been made at that time, nor until the passage of the Act of 1900 for the sale of such lands. It can not, with reason, be contended that the Legislature intended thereby to provide that public domain when leased should be subject to sale at any time thereafter when the Legislature should provide for the sale thereof. The meaning evidently is that, notwithstanding the lease, which would, without this provision, take the land off the market, such lands as were for sale should be sold whenever applied for. At that time no proposition had ever been advanced looking to the sale of the public domain. Having adopted the general rule that lands leased should be subject to sale, certain exceptions to the general rule were provided in the same section. Among these exceptions it was provided that "any lands that may be leased south and west of the line herein designated shall not be sold during the term of the lease until otherwise provided by law," following with a designation of the "absolute lease district." We understand relator's contention to be that this exception to the general rule does not apply to public domain. We are inclined to think he is right in this to this extent: that it was not intended to be made, and was not by the terms of the act itself made, applicable to such leases, but this provision and all other provisions of the existing laws with regard to the sale and lease of public domain are incorporated in and made a part of the Act of 1900, under which the application of relator to purchase was made. These particular sections were a part of "a tract of unsurveyed land containing more than 2560 acres" in Andrews County. The provision of the law authorizing the sale of this land is contained in section 3 of the Act of 1900 (chap. 2, Acts of Spec. Sess. of 26th Leg.), and is as follows: "Tracts of unsurveyed land containing more than twenty-five hundred and sixty acres shall be surveyed and sectionized under the direction of the Commissioner of the General Land Office before being

placed on the market for sale in the following named counties, to wit: Andrews, * * * provided said land may be leased without being sectionized, classified and surveyed; and provided further, that said land when leased or sold shall be sold and leased on the same terms, conditions and limitations as now provided by law for the sale and lease of other school land." The law does not provide further with regard to the sale of this land. Except by incorporating in the act the "terms, conditions and limitations" of the Acts of 1895 and 1897, relator's application would have given him no right to the land if it had not been under lease. One of the prime "conditions and limitations" was that if the land was in the absolute lease district it should not be sold during the life of an existing lease. There was no reason why these lands should not be sold, in all respects, just as other school lands, and the Legislature clearly intended to provide that they should be. It is suggested, however, by respondent that the Legislature could not, in the Act of 1900, have provided for a sale of these lands without the lessee's consent, during the life of an existing lease. It can hardly be questioned that a lease of these lands, authorized by law, would protect the lessee in his right to the use and possession of the land so long as he complied with the conditions, unless there was reserved to the State, either in the lease contract or in the law under which it was executed, the right to sell or to otherwise terminate the lease. There was no such condition or reservation in the lease contract. The only reservation of the right of sale of lands under lease, during the life of the lease, is that contained in article 4218s, that "all lands which may be leased shall be subject to sale at any time, except where otherwise provided herein." This, relator insists, and we may admit, does not apply to leases of public domain, made under the provisions of article 4218r. We think it follows as a necessary deduction from relator's argument, that there was at the time of the execution of the lease to Nelson Morris of this land, no reservation on the part of the State of the right to terminate the lease by a sale, and no condition or limitation of the lessee's right to the use and possession during the full term of the lease. If, then, the Legislature had intended by the Act of 1900 to put this land on the market and terminate the lessee's tenancy by a sale, before the termination of the lease, such would have clearly impaired the obligation of the contract, in violation of section 16, article 1, of the Constitution of this State.

*Camp & Caldwell* also filed briefs and argument for respondent.

*Willis E. Thorne* filed brief and argument on behalf of respondent Nelson Morris.

WILLIAMS, ASSOCIATE JUSTICE.—Relator has applied to this court for a mandamus to compel the Commissioner to accept his applications to purchase four sections of school land in Andrews County, which applications the Commissioner has rejected as conflicting with the

rights of his corespondent, Nelson Morris, as lessee from the State of the same lands. Relator contends that the lease is void for certain alleged reasons; and further, that, if it be not void, the land included in it is held subject to the right of the State to sell to actual settlers.

Prior to 1902 the land was a portion of a large tract of unsurveyed public domain. In accordance with the act of the Legislature of 1900 (Acts 26th Leg., 1st Called Sess., p. 29) the tract was duly surveyed, sectionized and incorporated in the school fund, and, in 1902, relator made his applications to purchase, as to the regularity and sufficiency of which no questions are raised except those discussed.

On the 15th day of August, 1890, the then Commissioner executed to one Wiggins a lease, No. 3301, for this public land, for a term of ten years from July 18, 1890, which was assigned to Nelson Morris. The rent was paid upon this lease until July 18, 1896, after which there was an attempted cancellation, the facts affecting which are in dispute and will be stated later. A new lease, No. 15445, for the same land, was executed to Nelson Morris, bearing date October 10, 1896, for a term of ten years from July 18, 1896. The rent was paid upon this lease until July 18, 1899, when the rent for the year 1899-1900 became due and was unpaid. After the expiration of the sixty days from the maturity of this installment, the Commissioner duly declared the lease canceled in accordance with the statute. On the 7th day of October, 1899, that officer executed to Morris another lease, No. 28841½, including the land, for a term of ten years from the 14th day of September, 1899. Morris had filed his application for a new lease before the expiration of the sixty days allowed in which to make payment. This lease was the one under which Morris held when relator applied to purchase.

1. We take up first, for convenience, relator's contention that, even if the lease in question is valid the land is nevertheless subject to sale. The proposition advanced is that the provisions of the statute of 1897, protecting from sale lands under lease, apply only to lands which were at that time surveyed school and asylum lands, and not to the public domain, not then incorporated into the school fund, and that, when the latter class of land was, under the Act of 1900, before referred to, and the proceedings under it, made a part of the school fund, they were by that statute made subject to sale without regard to pre-existing leases. We think that it is true that the laws previous to 1900 provided for the sale of those lands only which belonged to the named funds and did not contemplate any such disposition of unsurveyed public land; and that from this, as well as from the language of the Act of 1897 creating the absolute lease district, it follows that it was only those lands which were protected from sale, when leased, during the terms of the leases. But the other provisions of the statute, making leased lands, other than those thus protected, subject to sale during leases, seem likewise to apply only to such as belonged to the named funds. Now the Act of 1895, by its title and provisions (sec. 17, art. 4318r,

Rev. Stats.), plainly did authorize leases of the public domain, and those provisions were not affected by the amendatory Act of 1897. So that, following relator's argument to its legitimate conclusion, we have leases of public domain authorized by the Act of 1895, with no applicable provision of the law subjecting them to sale pending the lease. Were we to assume that the Legislature attempted by the Act of 1900 to make subject to sale lands held under such leases, regardless of the rights of the lessees, we would be confronted with a constitutional question of considerable difficulty and importance. This contention of relator would also suggest a serious question as to the applicability to such leases of the principles announced in the decision in the case of Ketner v. Rogan, 95 Texas, 559, so much relied on by him to sustain other contentions, but which rests mainly upon the provisions of the statutes regulating sales and leases of school lands. But we are relieved of the necessity of entering the wide field of discussion thus opened up by our conclusion that the Act of 1900 does not undertake, in bringing into the school fund such lands as those in question, when situated in the territory defined as the absolute lease district and under lease, to make them subject to sale without regard to the lease. Section 3 of the act provides that the lands mentioned "shall be subject to sale in the manner now provided by law for the sale of surveyed school lands, except where otherwise provided by law," and "that said lands when leased or sold shall be leased and sold on the same terms, conditions and limitations as now provided by law for the sale and lease of other school land." It seems plain to us that the purpose of these provisions was to have these lands, thus brought into the school fund, treated as other school lands were to be treated under all existing and applicable laws providing for the sale and lease of such lands. Applying the words used to the particular question under discussion, we find no doubt as to their sufficiency to control it. Among the rules "provided by law for the sale and lease of other school land" was one that, when situated in a defined territory and under lease, it was not subject to sale during the term of the lease. This was one of the "limitations" under which sales of the land newly added to the fund were to be made. General language could scarcely have been made more decisive of the question.

It is argued that section 7, which prescribes the order in which the claims of conflicting applicants to purchase are to be preferred, and which mentions, as second in order, those who were actual settlers on January 1, 1900, holding under lease, has the effect of restricting the rights of the lessee to that thus defined. But this section does not deal with the question as to when or how the land is to become subject to sale, at all. Assuming that a sale is to be made, it determines rights of priority among applicants, and fixes the right of a lessee when, the land being on the market, he seeks to become a purchaser. This is not an attempt to determine what his leasehold interest is under an undetermined lease. We conclude that, assuming the lease in question

to have been valid, the land was not subject to sale against the lessee's consent.

2. The next contention is that all the leases were void because the Commissioner had not, prior to their execution, prescribed rules and regulations under which they were to be made. If this contention were upheld it would be hard to sustain any sale or lease made since 1887; for all the laws since the one of that year have contained the provision on which the contention is based; and if the making of rules was a condition precedent to the power to lease, it would seem to be equally so as to the power to sell. The truth is that the power to sell and lease has never been made to depend upon the previous establishment of rules. The statutes prescribed certain preliminaries the arrangement of which invested the officer with power and made it his duty, by the express commands of the statute, to sell and lease. The statutes so abound with evidences of this that it would be tedious as well as useless to copy them. The adoption of regulations was not among the things that had to be done before sales and leases could be made.

3. Another objection to the validity of the leases executed since 1895 is that no advertisement was made by the Commissioner of his purpose to let the land. The statute of 1895, as originally passed, provided: "And all leases under the provisions of this act shall be advertised by the Commissioner in such manner as he may think best and let to the highest responsible bidder in such quantities and under such regulations as he may think to the best interest of the State." Within a few days after its enactment the Legislature, by amendment, substituted for the section containing the quoted provision another which made several alterations, one of which was from "shall be advertised" to "may be advertised." The purpose of this change is too obvious to require comment. The fact that the other changes were made by the amendment does not affect this one. The language, as finally settled, plainly left it discretionary with the Commissioner to advertise or not as he deemed best, and this discretion the courts have no power to control.

4. It is further urged that there was no legal cancellation of lease No. 3301, which by its terms ran until 1900; that it was in force when the two subsequent leases were executed, and that the latter were therefore void. The fact alleged in the petition to support this position is that the Commissioner, in attempting to cancel lease No. 3301, did not do so by a "writing under his hand and seal of office" filed among the papers relating to the lease as provided by the statute (art. 4218v, Rev. Stats.). The fact that such an instrument was not executed and filed is averred in the petition, but is not admitted in the answers. By the latter it is stated that no such paper is now among those relating to the lease in the Land Office, but whether or not it was ever executed and filed is not known to respondents: in substance, that the affiant who verified the petition had no other means of knowledge upon the subject than the fact that the instrument is not now among the papers;

that the lease and some of the other papers are missing; that upon the file wrapper inclosing the papers appeared the notation, "Canceled July 18, 1896, see lease No. 15445;" that respondent Morris was at the time in possession of the leased lands and took out the new lease and has ever since been in possession under the subsequent leases; and that he, the Commissioner and Wiggins have treated the first lease as canceled and abandoned. Upon this state of the pleading, the most that can be claimed in favor of relator is that a question of fact is presented as to whether or not the paper in question was in fact executed and filed at the proper time. The record, taken together, makes it evident that the negative is asserted upon the fact alone that the paper is not found where it should be. Against this are the presumption that the officer required to act duly performed his duty, and the facts that he and all persons concerned have acted as if the cancellation had been effectually made, and that other papers which should be in the Land Office are missing. We can not say that, if the fact were in issue before a jury, the evidence stated would not warrant a finding that the proper declaration of cancellation was made. It follows that this court, whose jurisdiction is limited to the decision of questions of law arising upon facts admitted or conclusively established, can not render a judgment based upon a fact thus in dispute. Teat v. McGaughey, 85 Texas, 478; Wooten v. Rogan, recently decided by this court.

But aside from this view, we are of the opinion that even if it be conceded that, in order to put an end to the rights of a lessee under his lease by the mere action of the Commissioner, this formal declaration of cancellation is essential, it is also true that such rights may be terminated by an informal cancellation when the power to cancel exists and all parties concerned agree to or acquiesce in it. It is certainly not the law that a lease must continue in existence notwithstanding facts have arisen authorizing its cancellation and all parties consent and submit to an informal cancellation and a letting or sale of the property as subject to sale or lease. The facts show that such was the character of this transaction if the formal cancellation was not made, and it is not permissible for a third party, if it would be for the lessee, after this lapse of time to reopen the subject. Insurance Co. v. Sears, 178 U. S., 327. The decision in Ketner v. Rogan in no way affects this question. In that case no power existed in the Commissioner and the lessee to cancel the existing lease, when the rent had been paid up and the contract was in full force, and, by another, virtually extend the term of letting to the exclusion of applications to purchase. It was, indeed, contended in the argument of the present case that the cancellation took place before the expiration of the sixty days after the annual interest became due, which must elapse before a cancellation is authorized, and that, hence, there was no power to cancel. This is not assigned in the petition as a ground for holding this cancellation ineffectual. The argument was based wholly upon an exhibit to the

petition upon which no affirmative allegation in the body of the petition was based, and this exhibit, even if sufficient to sustain relator's case, could hardly be looked to by the court for such a purpose. But it consists merely of a certificate of the State Treasurer showing when the last annual payment of rent had been made (July 18, 1895), and stating that the records of his office showed that the lease was canceled July 18, 1896, which date was within. the sixty days which the statute allowed for the payment of rent due in that year. But the answers explain that the cancellation and the new lease in fact took place after the time had expired, and that the date, July 18th, was given merely to make the new lease cover the whole time from July 18th until the date fixed for its expiration. This we must accept as true because we can not act upon disputed facts. It was urged that this was a mere evasion of the decision in the Ketner case, but this court has no power to inquire into this when the fact is disputed. As the facts upon which we must act appear, the rent was past due and the Commissioner had the power to cancel. He also had the power expressly given to relet to the same lessee upon a condition which there is no contention that the latter did not comply with. Rev. Stats., art. 4218v. The courts have nothing to do with the policy or wisdom of such provisions or the administration of them by the officer to whom it is committed. The power is given to the Commissioner to do these things and is one the exercise of which the courts can not prevent or undo.

5. What we have said is sufficient to dispose of the contention that lease No. 28841½ was void because made while No. 15445 was in force. The facts answer the contention, showing that the rent upon the last named lease, due in 1899, was not paid within sixty days after its maturity and that the cancellation was then regularly made and the new lease executed. The fact that Morris made application for the new lease before the time for the cancellation of the old had arrived did not affect the power of the Commissioner, when the proper time came, to cancel and relet as authorized by the statute.

*Writ refused.*