### G. H. BROCKENBROUGH v. MUTUAL RESERVE LIFE INSURANCE COMPANY.

(Filed 6 November, 1907).

**Insurance—Mutual Life Companies—Stockholder—Statute of Limitations—Estoppel.**

While the statute of limitations does not run against the non-resident defendant, a mutual life insurance company, the plaintiff, who was a policyholder therein, is estopped, after a lapse of nearly seven years without having paid his premiums thereon, from recovering the principal and interest paid on said policy.

WALKER and CONNOR, JJ., dissenting.

CIVIL ACTION, tried before *Peebles, J.,* and a jury, at October Term, 1906, of the Superior Court of MECKLENBURG County.

Plaintiff moved for judgment upon the facts alleged in the complaint and admitted in the answer. Motion overruled, and plaintiff appealed.

*Chase Brenizer* for plaintiff.
*John W. Hinsdale* for defendant.

CLARK, C. J. On 15 December, 1897, the defendant adopted a resolution under which it would assess the plaintiff according to the table for "attained age" endorsed on his policy. He paid the first assessment made upon that basis under protest, and thereafter paid them without objection till an assessment was levied 1 February, 1899, when he quietly

and silently dropped out, making no complaint or demand till the summons was issued in this action, 18 January, 1906.

In *Green v. Insurance Co.,* 139 N. C., 312, it is said that "the plaintiff voluntarily ceased payment and abandoned his policy. He cannot be heard to ask damages for its cancellation. *Insurance Co. v. Phinney,* 178 U. S., 327; *Insurance Co. v. Sears, ib.,* 347; *Ryan v. Insurance Co.,* 96 Fed. Rep., 796. In every case where damages have been allowed for the cancellation of a policy of insurance it was alleged and proved that the cancellation was wrongful. *Braswell v. Insurance Co.,* 75 N. C., 8; *Lovick v. Life Association,* 110 N. C., 93; *Burrus v. Insurance Co.,* 124 N. C., 9; *Hollowell v. Insurance Co.,* 126 N. C., 398; *Strauss v. Life Association, ib.,* 971; *Simmons v. Life Association,* 128 N. C., 469. * * * His motive, or the method of reasoning by which he arrived at his conclusion to abandon his policy, was irrelevant."

It is true that the statute of limitation does not run in favor of the nonresident defendant (*Green v. Insurance Co., supra*), but the plaintiff, having abandoned his policy and stopped payment thereon in February or March, 1899, cannot be heard to assert any rights thereunder in this action, nearly seven years thereafter. He is estopped by his abandonment and delay. 2 Pom. Eq., sec. 818, says upon this head: "This species of estoppel, as well as other kinds which consist of affirmative acts or representations, applies to corporations in their dealings with third persons and with their own stockholders. Conversely, stockholders may be estopped by their acquiescence from objecting to the acts of the corporations which are not illegal or *mala prohibita,* but *ultra vires.* When the rights of innocent third parties have intervened, express assent is not necessary to estop the stockholders. When they neglect to promptly and to actively condemn the unauthorized act and to seek judicial relief after knowledge of its being done, they will be deemed to have acquiesced and will be estopped as against innocent third persons." To same purport many other authorities can be cited.

BROCKENBROUGH *v.* INSURANCE CO.

.An insurance company exists by means of the payments it receives. These must be regular, that it may meet its liabilities. A member cannot drop out, disregard his duties and make no payments for nearly seven years, and then assert by action a claim that the other members be assessed to pay him what possibly he might have recovered if he had asserted his claim in apt time. Many thousands of new members have come in, who ought not to have the fund, created almost if not entirely of payments made since the plaintiff dropped out, subjected to payment of claims of which they had no notice and which may be thousands in number and aggregate hundreds of thousands of dollars in amount. If seven years' acquiescence and nonpayment of assessments do not estop the plaintiff, then there is no limit of time or of nonpayment that will bar. No one would be safe in becoming a member of a mutual life insurance company under such circumstances. *Leges subveniunt vigilantibus non dormientibus.* The Court properly sustained the demurrer to the evidence.

No Error.

WALKER, J., dissenting: The defendant contracted to insure the life of the plaintiff for the benefit of his wife, on 10 March, 1888, for the sum of $5,000, in consideration of an admission fee, annual dues and death-fund assessments to be levied from time to time and called mortuary premiums, which were payable at stated intervals, the amount of the premium varying according to the number of death losses, and depending upon the "sum which the executive committee may deem sufficient to meet the existing claims by death" for the period immediately preceding the date of the assessment, but the rate of assessment was fixed at $1.20 per $1,000 of insurance, that being the rate fixed by the schedule as of his then attained age, thirty-four years, the maximum amount to be collected annually being $11.77 on each $1,000 of insur-

ance. This was to be the permanent rate. The plaintiff paid the admission fee, the annual dues and the assessments regularly for more than seventeen years, when the defendant, without his consent and, as will appear hereafter, against his protest, which was made when he was apprised of the fact, changed the rate of assessment by increasing it in June, 1895; and again, in January, 1898, not content with having once grossly and arbitrarily violated its contract with the plaintiff, the terms of which had been clearly and irrevocably settled by itself in the contract, the defendant again raised the rate of assessment considerably and much higher in proportion than the increased rate of 1895. The plaintiff then protested against the increase of his rate, which the company had solemnly agreed should remain at the figure stated in the schedule for his age of entrance as a member of the company, telling the defendant at the time that he considered the increase as illegal. The company notified him that if he did not pay what was clearly an extortionate amount, his policy would be forfeited, and, under the compulsion of this unwarranted and inexcusable threat, and under his protest, he continued to pay the unlawful assessments for the short period of the year 1898 between March and December, when he refused to pay any longer. He testified that he thought the assessment was illegal, but he paid under protest, because the company threatened, in its notice to him, that if he did not pay the assessments, his policy would be forfeited, and that he believed his protest against the illegality of the increase was sufficient to protect him. He was corroborated by the agent of the company to whom he paid the assessments. And yet it is decided that the plaintiff is equitably estopped to recover damages for this arbitrary conduct of the company and its willful breach of the contract, because, having paid the increased premium for a few months under protest, he refused in January to be longer imposed upon by the defendant through its illegal exactions, or to be intimidated by its threats, and failed, after

January, 1899, for a few years, or until this action was brought, to pay the unlawful assessments. It is said that these premiums are necessary to the continued existence of the company. Surely it cannot be meant that the law regards illegal assessments in this light. But there is one thing that is essential to the maintenance of insurance companies of every kind, and of every other legitimate enterprise, and this is honesty and integrity in the administration of its affairs, and recent events have convinced us more and more, if we needed any such proof, of the truth of the assertion. And I may say that it applies with peculiar force to insurance companies, as the contract on the company's part is to be performed at a time when the member or policyholder may not be present to vindicate his rights, or those of the beneficiary or object of his bounty, under the contract. He must rely very largely upon the good faith of the company, and unless by a careful regard for their obligations, a strict compliance with their engagements and a faithful fulfillment of their promises, the confidence of those whose patronage they seek is secured, they will in very truth find their career eventually cut short for the lack of premiums to pay expenses, much less profits.

With profound respect for my brethren, from whom I greatly differ, the doctrine of equitable estoppel has nothing whatever to do with the facts of this case, when properly considered. To apply it will produce the very wrong which was sought to be avoided when it was first adopted. It is founded, in part, upon the maxim of the law that no man shall be permitted to take advantage of his own wrong; and yet, if it is to control the decision in this case, the defendant will be permitted to do that very thing. In *Farmers Insurance Co. v. Knight,* 162 Ill., 470, decided by a court whose opinions are entitled to the greatest weight, it was said: "The evidence introduced on the trial tends to prove that the managers of the insurance company, for several years, in making assess-

ments, did not adhere to the statute, and that in a number of cases more money was raised than was at the time required to meet losses. But these violations of the statute did not ripen into a right; nor are we aware of any principle which would preclude a policyholder of the insurance company from calling in question the validity of an assessment, although he may have previously paid assessments which did not conform to law. We do not think the doctrine of estoppel applies to such a case." Our case is even stronger than that one, because here the managers did not merely raise more than was necessary to pay losses, but actually made a radical change in the contract—in other words, repudiated the contract with the plaintiff and attempted by threats and compulsion to substitute one of their own.

But I now cite a case which seems to be exactly in point. The Court said, in *Covenant Mutual Life Association v. Tuttle,* 87 Ill. App., at p. 328: "In 1895 another change was made in the manner of assessing. The group plan was abolished and each member was assessed according to the estimated cost of his insurance at the time he entered the society, and he was also assessed, not only to pay death losses, but also for the purpose of creating a permanent fund. Rather than take the possible chances of having his certificate forfeited and losing his insurance, Tuttle paid these assessments. Now this is the extent of his supposed wrongdoing, upon which is predicated the right of invoking the doctrine of estoppel against appellee. Can it be that, because appellant violated its contract on former occasions by making illegal assessments, and Tuttle did not take the chance of having his certificate forfeited by refusing to pay them, he or his beneficiary is estopped from denying the legality of assessment No. 149, which was for an amount so largely in excess of any previous assessment? We think not. He might have been content to pay a small increase on his original contract rate. And because he did so, shall it be said he was therefore bound to

pay an amount ten times as great? We think to so hold would be unreasonable and would be permitting the wrong-doer to invoke the doctrine of estoppel against the party injured. This, we think, ought not to be done. The doctrine of estoppel, when properly applied, is founded upon the highest principles of morality, and recommends itself to the common sense and justice of every one. Herman on Estoppel, p. 291, sec. 272. Equitable estoppels, or estoppels *in pais,* only arise when the conduct of the party estopped is fraudulent in its purpose or unjust in its results (Herman, p. 335, sec. 321); or, as the rule is otherwise stated, 'Where one, by his words or conduct, willfully causes another to believe the existence of a certain state of things, and induces him to act on that belief, so as to alter his previous position, the former is concluded from averring against the latter a different state of things as existing at the same time.' (Bigelow on Estoppel, 433, 434). It certainly cannot be said that Tuttle, in paying previous illegal assessments, acted fraudulently, or that he willfully did anything calculated to mislead others to their injury. When he paid illegal assessments, he did so under a moral compulsion, and the threat, implied at least, that if he did not pay his certificate would be forfeited and the provision made for his wife in the event of his death be thereby lost. Did this conduct on his part warrant appellant in increasing Tuttle's assessments tenfold? In other words, can appellant thus be permitted to take advantage of its own wrong? Would this commend itself to the common sense and justice of any one, or be in accordance with the highest principles of morality, upon which the doctrine of estoppel is said to have its foundation? We certainly think not."

I must be indulged for quoting so fully from that case, because it appears to be so much like ours, and the principles stated certainly fit the facts in this record. Besides, it is a clear, strong, convincing statement of the law, and, I may

add, is based upon an eminently just principle.    The mor-
ality of this case is all with the plaintiff; the equity surely is,
and I believe the law also is.    Why multiply authorities to
sustain a proposition which, to my mind at least, is self-
evident?

But it is suggested that he should be estopped *in equity,*
mind you, because, after paying unjust and unlawful pre-
miums under protest for a short time after March, 1898, when
the second increase of the rate of assessment was made, and
after being threatened with a loss of a policy upon which he
had paid the defendant premiums for many years, he refused
to be longer intimidated and ceased paying until this suit was
commenced.    Cooley, in his Briefs on the Law of Insurance,
Vol. III, p. 234, says: "As a member of a fraternal associa-
tion is not liable for an assessment unless the same is valid
and made in accordance with the rules of the association and
the provisions of his certificate, it naturally follows that a
member's rights under his certificate are not subject to for-
feiture for a failure to pay an invalid assessment.    This
being the rule, the burden is on an association, relying on a
forfeiture of a certificate for nonpayment of assessments, to
prove a duly authorized and valid assessment."    He cites
many authorities to sustain the principle, and, strange to say,
they all regard it as a proposition that should be taken for
granted.    *Margesson v. Benefit Association,* 165 Mass., 262;
*Langdon v. Benevolent Association,* 166 Mass., 316; *Roswell
v. Equitable Aid Union,* 13 Fed. Rep., 840; *American Mutual
Aid Society v. Helburn,* 81 Ky., 1; *Stewart v. Grand Lodge,*
100 Tenn., 267; *Miles v. Life Association,* 108 Wis., 421;
*Shea v. Massachusetts Benevolent Association,* 160 Mass.,
289; *Coyle v. Benefit Society,* 2 S. W., 676.    In Illinois the
matters involved in this case have been frequently before the
courts, and invariably have they decided against the conten-
tion now made by the defendant.    *N. L. Assessment Co. v.
Erlenkoetter,* 90 Ill. App., 99; *Life Society v. Wilson,* 91 Ill.

App., 667; *Tourville v. Brotherhood,* 54 Ill. App., 71; *Order of Chosen Friends v. Austerlitz,* 75 Ill. App., 74; *P. R. C. Union v. Warezak,* 82 Ill. App., 351.    See, also, *Murphy v. Life Association,* 114 Fed. Rep., 404.    These authorities, and many others to the same effect which could be cited, variously state the governing principle, as follows: A member of a beneficiary association is not bound by an illegal assessment, and no forfeiture can be insisted upon because of its non-payment.    91 Ill. App., 667. ‚ The corporate rights of a member of an insurance company may be subject to the control of the corporation, but his rights as a party insured rest on the contract (*Bragaw v. Supreme Lodge,* 128 N. C., 354); and when the party is not bound by an assessment, because made in violation of his contract, he does not forfeit his insurance by not paying it.    Such a forfeiture can rest only upon strict legal right, and it must abide inflexibly the terms of the contract.    90 Ill. App., 99; 100 Tenn., 267.    A benefit association has no right to cancel insurance for failure to pay an illegal assessment; and the fact that earlier calls under the same assessment have been made and paid does not enlarge the contract or justify the association in declaring a forfeiture, nor does it constitute any defense by way of estoppel or otherwise.    165 Mass., 262, and 166 Mass., 316.    A benefit association claiming that a membership certificate has been forfeited by failure to pay an assessment must show affirmatively that the assessment was imposed in exact accordance with the insurance contract; otherwise its defense must fail.    106 Wis., 421, and 13 Fed. Rep., 840.    A legal assessment and proper call are treated by the law as conditions precedent to the right to declare a forfeiture upon a subsequent refusal by the member to pay.    160 Mass., 289; 114 Fed Rep., 404; 100 Tenn., 267.    So strict is this rule that the association is not even allowed to show that its new plan of assessments is more equitable than the old, because it is bound by the contract of insurance as ascertained from its charter and the

agreement with the member. 85 Ky., 1. An offer to pay the illegal assessment constitutes no more than a waiver of notice that it has been made, and is no waiver of matters affecting its regularity or validity, and it is no estoppel. 100 Tenn., 267. Until a member is in default, he cannot be suspended or his rights forfeited. It is incumbent upon the association to prove that unpaid assessments were legally made and due, and there is no default by reason of nonpayment of them, or any of them, until this appears. The company must act first and take the burden of proof, and not the member. 82 Ill. App., 351. Forfeitures are not favored by the law, and an association insisting upon one must make clear proof and show that it has acted regularly and legally before it can call upon the member to prove anything. If there has been an illegal assessment, there can be no forfeiture when the member has simply ceased to pay. 75 Ill. App., 74. The association will not even be permitted to allege a forfeiture for failure to pay an assessment unless it appears affirmatively at the same time by proper averment that it has proceeded legally in levying, and in the absence of such allegation and proof, a tender of the amount of the assessment is, of course, unnecessary. 54 Ill. App., 72. Lastly and convincingly, in a contract of mutual benefit insurance the member acts for himself, and not as a part of the society; his rights rest upon his contract of insurance, and not upon his contract of membership in the society. A corporator in a mutual benefit society, like a stranger, may enter into a contract of insurance with it, and his rights under the contract will be as fully protected as those of a stranger. A member of such a society, in paying previous illegal assessments, cannot be said to have acted fraudulently, or willfully to have done anything calculated to mislead others to their injury, so as to equitably estop himself from questioning subsequent illegal assessments and refusing to pay the same. 87 Ill. App., 309. It is well settled that no forfeiture can be established except for a viola-

tion of the precise terms and conditions laid down in the laws of the society and in the contract; and if an assessment be levied illegally, the member is under no obligation to pay it, nor are his rights in the least affected by its nonpayment. Bacon on Benefit Societies (3d Ed.), sec. 377. This last statement of the law is supported by the citation of numerous cases in the notes to section 377. I might cite authorities indefinitely stating this proposition one way or another, but they all come to this: that a wrongdoer cannot take advantage of his own wrong and avail himself of so just a doctrine as that of equitable estoppel to enable him to do so. That principle was introduced into equity jurisprudence to prevent wrong, and not to encourage or promote it; and, further, it does not apply in favor of a benefit association seeking to forfeit the insurance of one of its members for nonpayment of assessments when the latter have not been imposed according to his contract or the law.

It is not necessary for me to argue that the defendant has violated its contract of insurance with the plaintiff. It has made such a fundamental change in it as to relieve him from paying any assessment until it restores him to his rightful position as a member of the company under his contract. *Strauss v. Life Association,* 126 N. C., 971; *same case,* 128 N. C., 465. It had no power to violate the contract or to injuriously affect vested rights. *Bragaw v. Supreme Lodge,* 128 N. C., 354; *Makely v. Legion of Honor,* 133 N. C., 367; *Sherrod v. Insurance Co.,* 139 N. C., 167.

It seems to me that the decision in this case is in conflict with two well-considered precedents in this Court. Upon the question of estoppel, or waiver, it sets aside the principle stated and applied in *Makely v. Legion of Honor,* 133 N. C., 367. It was there said that no proof had been offered of an intentional waiver, and "He (plaintiff) received nothing from defendant in consideration of any implied waiver." The plaintiff had paid, and continued to pay, according to the

change made by the society.    As to the question of estoppel,. it was decided in *Strauss v. Life Association,* 126 N. C., 971, that when the defendant broke the contract of insurance the plaintiff had the right to cease paying the illegal assessments, and could recover his damages for the breach, which, in that case, it was said, should be measured by the amount of premiums and dues paid by him.    Whether this is, in principle, the correct rule for assessing the damages, it is not necessary for me now to say.    It is the right of the plaintiff to recover, and not the *quantum* of his damages, that I am discussing.

The decision in *Green v. Insurance Co.,* 139 N. C., 312, so much relied on by the majority, has no bearing upon the question.    It was decided upon a principle which has nothing whatever to do with the facts of our case.    I admit that when a party "voluntarily" and wrongfully abandons his policy, as the plaintiff did in *Green's case,* he cannot recover.    Nobody will gainsay that proposition.    In that case the decision is put expressly upon the ground that it did not appear that the insurance company had violated its contract.    It was simply a case where the defendant lawfully laid assessments, and the plaintiff, without any legal excuse, refused to pay them.    And the other cases which are cited in the opinion of the Court with *Green's case* are to the same effect.    It is not denied, and cannot be, that there was a clear and willful breach of the contract in our case.

It does not appear that anybody has, in fact, been prejudiced by the action of the plaintiff, if that is a relevant inquiry.    The case was tried on the plaintiff's proof alone, and he was nonsuited.    We are confined to that proof, and it is to be taken as true.    The plaintiff protested against the increase of the assessment, and his subsequent payments were, of course, covered by the protest.    He was not protesting against payments, but against the illegal action of the society in raising the assessment so as to increase his payments.    His payments, therefore, did not estop him, upon any principle of

the law, and certainly not upon the authorities. He had the right to stop paying at any time under an illegal assessment, and to continue to refuse to pay, as he did, until a proper assessment was made. He was not bound to make any tender, for two reasons—first, because the assessment was excessive and illegal; and, second, because he could not know the amount until there was a lawful assessment.

It does not lie in the mouth of the defendant to say that it did not know why Mr. Brockenbrough had refused, after December, 1898, to pay the assessments. He distinctly and positively protested against the increase of the rate, the gross violation of its contract with him, and its arbitrary conduct, and paid for a short time under this protest and the constant threat that he would lose the benefit of the insurance if he failed to pay when called upon by the society for the money. This was done, as he says, by reason of the threat, and, perhaps, also, in the hope that, upon reflection, the defendant would see the error of its way and repent of the grievous wrong it had done. His refusal to submit to its illegal exactions any longer is the same as if he had resisted the unlawful action of the society in the beginning, and continued to do so; and we have seen that, by the highest authority, he is not to be prejudiced, either by the payment under protest or by the failure to pay that which he did not owe.

It is strange that, upon the facts appearing in the record, the defendant, which has been from the beginning of the transaction to the end in the wrong, can successfully resist the plaintiff's recovery. My conclusion is that the nonsuit should be set aside and the plaintiff be allowed to recover the amount of his damages, to be fixed by the jury, under the principles of law applicable to that phase of the case.

CONNOR, J., concurs in dissenting opinion of WALKER, J.