# MUTUAL LIFE INSURANCE COMPANY *v.* PHINNEY.

CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE NINTH
CIRCUIT.

No. 12.   Argued January 22, 23, 1900.—Decided May 28, 1900.

Upon the showing made by the Court of Appeals, it is clear that that court
had jurisdiction, and should have proceeded to dispose of this case on its
merits, instead of dismissing it for want of jurisdiction.

The plaintiff in error is a corporation, organized under the laws of the State
of New-York, and doing business as life insurers in the city of New York.
It had an agent in the State of Washington, to whom Phinney, a resident
in that State applied for a policy on his life.   The application stated that
it was made subject to the charter of the company and the laws of New
York.   A policy was issued which provided that on its maturing pay-
ment was to be made at the home office of the company in New York,
and on its receipt Phinney paid the first premium.   The policy provided
that he should pay a like premium for twenty years, if he should live so
long, and that the policy should become void by non-payment of the pre-
mium, with a forfeiture of previous payments.   Phinney failed to make
the next annual payment.   Then he surrendered the policy to the local
agent.   He died without having made that payment, or the next one
which matured before his death.   His widow was appointed his executrix.
She presented to the company a claim for the amount of the insurance
under the policy.   It was rejected.   This suit was thereupon brought.
In its answer the company set up that the contract was not to be taken
as a contract under the laws of the State of New York, but under the
laws of the State of Washington, and the company asked this instruction,
which the court declined to give.   " If you find from the evidence in this
case that the said Guy C. Phinney stated to the representative of the
defendant in the State of Washington that he could not pay the premium
falling due September 24, 1891, and that he did not pay nor tender the
same, and that he thereafter surrendered said policy to the defendant's
representative, they mutually believing and understanding that the same
was of no force or validity then or thereafter, by reason of the non-
payment of the said premium, this would constitute an abandonment
and rescission of this contract by both parties thereto, and would put an
end to the same; and if you find the facts so to be, you must find a ver-
dict for the defendant."   The jury trial resulted in a verdict and judg-
ment for the plaintiff.   This was taken in error to the Court of Appeals
for the Ninth Circuit which dismissed the writ of error on the ground
that it had no jurisdiction by reason of a failure on the part of the plain-
tiff in error to file the writ in the office of the trial court.   *Held:*

(1) That the Court of Appeals had jurisdiction;

(2) That, without deciding it, the court would hold for the purposes of this case that the contract was made under the laws of the State of New York, and was governed by the laws of that State;

(3) That it is to be presumed that each party knew what the laws of New York were, and neither could be misled by any statement in respect thereto on the part of the other;

(4) That there is nothing in the New York statute (if controlling at all) to prevent the parties from dealing with that as with any other contract, and if they chose to abandon it their action is conclusive.

After the company had once excepted to the refusal of an instruction which it had asked, and excepted to those which were given, it did not lose the benefit of such exceptions by a request that the court repeat the instructions excepted to, in connection with certain answers made to questions propounded by the jury.

On September 22, 1890, Guy C. Phinney, a resident of the State of Washington, applied to the Mutual Life Insurance Company of New York for a policy of insurance on his life for the sum of $100,000, payable to his executors, administrators or assigns. This application was forwarded by the local agent at Seattle to the general agent of the company at San Francisco, and by him to the home office of the company in New York city. By reason of such application a policy was issued to Phinney, bearing date September 24, 1890, forwarded to the general agent at San Francisco, by him to the local agent at Seattle, and by the latter delivered to Phinney, who received it, and at the same time paid the first year's premium, amounting to $3770. The policy provided that Phinney should pay the annual premium of $3770 on September 24 of each year thereafter for twenty full years, provided he should live so long, and also "this policy shall become void by non-payment of the premium; all payments previously made shall be forfeited to the company, except as hereinafter provided." This last exception referred to certain provisions as to surrender value and readjustment of the amount of insurance on the payment of a certain number of payments, none of which are material to the question at issue in this case. Prior to September 24, 1891, notices were sent by both the general agent at San Francisco and the local agent at Seattle to Phinney that his premium would be due on September 24, 1891. Twice between the time

of the receipt of this notice and the 24th of September, 1891, Phinney met Stinson, and requested him to accept his notes for the payment of the premium. This proposition was declined by Stinson, who declared at the time that he was unable to advance the premium for Phinney. Some time after September 24, 1891, (the exact date being unknown, but, according to the testimony from four to six weeks thereafter,) Phinney again met Stinson, and stated that he was prepared to pay the premium, but was told that it could not be accepted unless a certificate of health was furnished. No certificate of health was ever furnished. Phinney stated that he could not obtain it, as he had been rejected by another company a few days before, nor was there ever any formal tender of the premium. In December, 1891, or January, 1892, Stinson requested Phinney to allow him to have the policy to use for canvassing purposes, and Phinney thereupon surrendered the policy to the agent, with the statement that as the same had lapsed he had no further use for it. Stinson received the policy, and never returned it to Phinney. On September 24, 1892, the premium falling due on that day was neither paid nor tendered by Phinney, nor did he after the surrender of the policy in December, 1891, or January, 1892, ever take any action in regard thereto, or pay, or offer to pay, any premium thereon. On September 12, 1893, Phinney died, leaving his last will and testament, wherein he nominated the plaintiff as executrix. Nothing was done by her under this policy until July, 1894, although Phinney held policies in two other companies at the time of his death, proofs in respect to which were presented by the executrix within one month after his death. At that time she wrote to the insurance company a letter, in which she stated as follows:

"SEATTLE, WASH'N, *July* 11, 1894.
"The Mutual Life Insurance Co. of New York:
"Gentlemen: On September 24, 1890, my husband, Guy C. Phinney, took out a policy, No. 422,198, in your company in the sum of one hundred thousand dollars. He died in this city last September 12, 1893. Not being familiar with his affairs, and the policy being mislaid, I was not aware that he held such

a policy until a few days ago, when the matter was brought to my attention."

In addition, it appears that on the 16th day of September, 1893, in her application for probate of her husband's will, she filed an affidavit, which contained these statements:

"Real estate, consisting of lands in said King County, of town lots in the city of Seattle, and of improved city property, the exact description of all which is at this time unknown to your petitioner, but which is entirely community estate, the value of which is about three hundred thousand dollars; that there is personal property of various kinds, all of the same being community property of the value of about fifty thousand dollars; that the total estate of said deceased, including the community interest of your petitioner, who is the widow of the said deceased, does not exceed in value the sum of about three hundred and fifty thousand dollars."

In July, 1894, (evidently at the suggestion of counsel,) she presented her claim under the policy, which was rejected, and thereupon this suit to recover thereon was brought in the Circuit Court of the United States for the District of Washington.

At the time the application was made and the policy issued the following statute was in force in the State of New York:

"Section one of chapter 341 of the laws of eighteen hundred and seventy-six, entitled an 'Act regulating the forfeiture of life insurance policies,' is hereby amended so as to read as follows:

"SEC. 1. No life insurance company doing business in the State of New York shall have power to declare forfeited or lapsed any policy hereafter issued or renewed by reason of nonpayment of any annual premium or interest, or any portion thereof, except as hereinafter provided. Whenever any premium or interest due upon any such policy shall remain unpaid when due, a written or printed notice stating the amount of such premium or interest due on such policy, the place where said premium or interest should be paid, and the person to whom the same is payable, shall be duly addressed and mailed to the person whose life is assured, or the assignee of the policy, if

notice of the assignment has been given to the company, at his or her last known post office address, postage paid by the company, or by an agent of such company, or person appointed by it to collect such premium. Such notice shall further state that unless the said premium or interest then due shall be paid to the company or to a duly appointed agent or other person authorized to collect such premium within thirty days after the mailing of such notice, the said policy and all payments thereon will become forfeited and void. In case the payment demanded by such notice shall be made within the thirty days limited therefor, the same shall be taken to be in full compliance with the requirements of the policy in respect to the payment of said premium or interest, anything therein contained to the contrary notwithstanding; but no such policy shall in any case be forfeited or declared forfeited or lapsed until the expiration of thirty days after the mailing of such notice. Provided, however, that a notice stating when the premium will fall due, and that if not paid the policy and all payments thereon will become forfeited and void, served in the manner hereinbefore provided, at least thirty and not more than sixty days prior to the day when the premium is payable, shall have the same effect as the service of the notice hereinbefore provided for.

" Sec. 2. The affidavit of any one authorized by section one to mail such notice, that the same was duly addressed to the person whose life is assured by the policy, or to the assignee of the policy, if notice of the assignment has been given to the company, in pursuance of said section, shall be presumptive evidence of such notice having been given." Act of May 23, 1877, Laws of 1877, c. 321.

In 1892, and after the first default in the payment of premium by Phinney and the surrender of his policy to the agent, Stinson, the following statute was substituted for the act of 1877:

" Sec. 92. No forfeiture of policy without notice. — No life insurance corporation doing business in this State shall declare forfeited, or lapsed, any policy hereafter issued or renewed, and not issued upon the payment of monthly or weekly premiums, or unless the same is a term insurance contract for one year or less, nor shall any such policy be forfeited, or lapsed, by reason

of non-payment when due of any premium, interest or instalment or any portion thereof required by the terms of the policy to be paid, unless a written or printed notice stating the amount of such premium, interest, instalment, or portion thereof, due on such policy, the place where it should be paid, and the person to whom the same is payable, shall be duly addressed and mailed to the person whose life is insured, or the assignee of the policy, if notice of the assignment has been given to the corporation, at his or her last known post office address, postage paid by the corporation, or by an officer thereof, or person appointed by it to collect such premium, at least fifteen and not more than forty-five days prior to the day when the same is payable.

"The notice shall also state that unless such premium, interest, instalment or portion thereof, then due, shall be paid to the corporation or to a duly appointed agent or person authorized to collect such premium by or before the day it falls due, the policy and all payments thereon will become forfeited and void, except as the right to a surrender value or paid-up policy as in this chapter provided.

"If the payment demanded by such notice shall be made within its time limited therefor, it shall be taken to be in full compliance with the requirements of the policy in respect to the time of such payment; and no such policy shall in any case be forfeited or declared forfeited or lapsed, until the expiration of thirty days after the mailing of such notice.

"The affidavit of any officer, clerk or agent of the corporation, or of any one authorized to mail such notice, that the notice required by this section has been duly addressed and mailed by the corporation issuing such policy, shall be presumptive evidence that such notice has been duly given." Laws 1892, c. 690.

The application made by Phinney for the policy contained this statement: "This application is made to the Mutual Life Insurance Company of New York, subject to the charter of the company and the laws of the State of New York." The policy stipulated that on its maturing the insurance company would "pay at its home office in the city of New York." It also stipulated that the annual premium should be payable "to the com-

pany at its home office in the city of New York." The policy also contained this provision:

" Payment of premiums.—Each premium is due and payable at the home office of the company in the city of New York, but will be accepted elsewhere when duly made in exchange for the company's receipt, signed by the president or secretary. Notice that each and every such payment is due at the date named in the policy is given and accepted by the delivery and acceptance of this policy, and any further notice, required by any statute, is thereby expressly waived."

In its answer the company pleaded that the contract was to be taken as a contract made in the State of Washington, and not controlled by the laws of the State of New York, because the application stipulated that the contract "shall not take effect until the first premium shall have been paid and the policy shall have been delivered." In fact, the policy was delivered and the premium paid in the State of Washington. It also pleaded the other provisions in reference to the failure to pay the annual premium, and the waiver, abandonment and rescission of the contract by the assured under the circumstances hereinbefore named.

The case came on for trial on these pleadings before the court and a jury, and resulted in a verdict and judgment for the plaintiff for the amount of the policy, less the unpaid premiums. The case was thereupon taken on error to the United States Circuit Court of Appeals for the Ninth Circuit, which court dismissed the writ of error on the ground that it had no jurisdiction by reason of a failure on the part of the plaintiff in error to file the writ of error in the office of the clerk of the trial court. 48 U. S. App. 78. Thereupon application was made to this court, and the case brought here on certiorari.

*Mr. Julien T. Davies* for petitioner. *Mr. Edward Lyman Short, Mr. John B. Allen* and *Mr. Frederic D. McKenney* were on his brief.

*Mr. Stanton Warburton* for respondent. *Mr. A. F. Burleigh* was on his brief.

MR. JUSTICE BREWER, after stating the case, delivered the opinion of the court.

The first question naturally is in respect to the jurisdiction of the Circuit Court of Appeals.   The transcript filed in that court, in addition to the record of the proceedings on the trial, which trial culminated in a judgment on October 17, 1895, contained: First, a petition for a writ of error filed by counsel for the insurance company, on December 14, 1895; then an order by the trial judge, allowing the writ of error and fixing the supersedeas bond at $125,000; an assignment of errors; a supersedeas bond, approved by the trial judge; a citation signed by him, and service admitted by counsel for the plaintiff, all these on the same day.   In addition, a return by the marshal, showing personal service on the plaintiff of the citation; the writ of error allowed by the trial judge, and an indorsement thereon by the clerk of the trial court (by deputy) in the following language:

"Received a true copy of the foregoing writ of error for defendant in error.   Dated this 14th day of December, 1895. A. Reeves Ayres, Clerk of the United States Circuit Court for the Ninth Circuit, District of Washington.   By R. M. Hopkins, Deputy Clerk."

On the hearing in the Court of Appeals an affidavit of the deputy clerk of the trial court was filed, which, after averring that the petition and assignment of errors, the orders granting the writ of error, and fixing the amount of the bond, and the bond, were each on file in his office and all bore the following indorsement: "Filed December 14, 1895.   In the U. S. Circuit Court.   A. Reeves Ayres, Clerk.   By R. M. Hopkins, Deputy Clerk;" stated that upon the filing of these papers he prepared a writ of error, issued and delivered it to R. C. Strudwick, one of the attorneys of the insurance company, who took the same from his office, and added:

"That a few minutes thereafter the said Strudwick returned to my office, and delivered to and lodged and filed with me said writ of error, with the allowance thereof indorsed thereon by the before mentioned judge, and at the same time delivered to

and lodged and filed with me a copy of said writ for the use of defendant in error.

"That said original writ of error remained in my office and in my custody from said 14th day of December, 1895, until the 4th day of January, 1896, at which time I transmitted the same, with my return thereto, to this honorable court.

"That the original citation herein, a copy of which appears on pages 395 and 396 of the printed record herein, was returned to and filed with me by a deputy marshal of the United States for the District of Washington, on the 18th day of December, 1895, and the same remained in my office and in my custody and control from said date until the same was transmitted to this honorable court, together with the writ of error and return thereto on the 4th day of January, 1896. It has not been my custom to indorse original citations and writs of error at the time they are filed with or served upon me, for the reason that I have deemed the same as writs of the Circuit Court of Appeals to be indorsed by the clerk of said court upon his receipt of the same with my return thereto; but, as a matter of fact, the writ of error and citation herein were actually delivered to and filed and lodged with me as above stated."

Upon these facts we are clearly of opinion that jurisdiction was vested in the Court of Appeals. The majority of that court, in sustaining the motion to dismiss, relied on the following decisions of this court: *Brooks* v. *Norris,* 11 How. 204–207; *Mussina* v. *Cavazos,* 6 Wall. 355; *Scarborough* v. *Pargoud,* 108 U. S. 567; *Polleys* v. *Black River Improvement Co.,* 113 U. S. 81; *Credit Company, Limited,* v. *Arkansas Central Railway Co.,* 128 U. S. 258; in the first of which it was said by Chief Justice Taney: "It is the filing of the writ that removes the record from the inferior to the appellate court, and the period of limitation prescribed by the act of Congress must be calculated accordingly. The day on which the writ may have been issued by the clerk or the day on which it is tested are not material in deciding the question."

In that case the question presented was one of limitations, and not what was necessary to constitute a filing. The statute requiring writs of error to be brought within a certain time, the

question determined was whether the mere allowance or issue of the writ constituted the bringing of the writ of error within the meaning of the statute, or whether, as was held, it was not brought, had not performed its office, until it had been filed with the clerk of the trial court. In this case there is no question of time. All the proceedings, with a view of taking the case to the appellate court, were had within less than three months from the date of the judgment. The transcript filed in the Court of Appeals made it clear that everything which the trial judge was required to do was done, the writ of error was allowed, the citation signed and bond approved, and also that the citation was duly served upon the counsel for the plaintiff, and service accepted. It also showed that a copy of the writ of error was received and filed by the clerk of the trial court, and while it is true that it did not show that the original writ of error was filed in his office, yet the affidavit made by the deputy clerk (which is not disputed) disclosed that it was so filed, and on the same day with the other proceedings for perfecting the transfer of the case to the Court of Appeals. Now, while it may be technically true, as said by the majority of the Court of Appeals, that the indorsement on the copy of the writ of error of its receipt for the benefit of the defendant in error, plaintiff below, was under section 1007 of the Revised Statutes, with a view to a supersedeas, and may not itself be sufficient evidence of the filing of the original writ, yet the affidavit of the deputy clerk, who had charge of the office, shows positively that it was left with him and filed. If it was left with him and he failed to indorse it as filed, can it be that his omission defeats the party's right to transfer the case to the appellate court? Is it within the power of a clerk to overrule the action of the Judge, and prevent an appeal or writ of error which he has allowed? When the Judge has done all that is necessary for him to do to perfect the transmission of the case to the appellate court, and the party seeking review has done all that is required of him, can it be that the omission of a clerk (if there was such an omission) can prevent the jurisdiction attaching to the appellate court? Obviously not. "When deposited with the clerk of the court, to whose judges it is directed, it is served."

*Mussina* v. *Cavazos*, 6 Wall. 355, 358. While we have always been careful to see that the required order of procedure has been complied with before any case shall be considered as transferred from a lower to a higher court, that the party seeking a review must act in time and must make a substantial compliance with all that the statute prescribes, at the same time we have been equally careful to hold that no mere technical omission which did not prejudice the rights of the defendant in error should be made available to oust the appellate court of jurisdiction. We are clear that upon the showing made the Court of Appeals had jurisdiction, and should have proceeded to dispose of the case upon its merits.

Coming now to the merits, many questions have been exhaustively discussed by counsel in brief and argument. One is, to what extent, if at all, the law of New York controls in respect to the policy sued on.

By the insurance company it is contended that it does not apply; that it operates only upon contracts of insurance consummated within the State of New York; that it commences "no life insurance company doing business in the State of New York shall have power," etc.; that it thus includes foreign as well as local insurance companies, and as it confessedly cannot control the operations or modify the contracts of foreign insurance companies made outside the State, the true construction is that it applies to both foreign and local companies only as to business done within the State; that as the application was signed by the insured in the State of Washington, and when received by the company in New York was there accepted only conditionally, and as the policy which was prepared and forwarded to an agent of the company in Washington contained an express stipulation that it should "not take effect until the first premium shall have been paid and the policy shall have been delivered," and as the premium was in fact paid and the policy delivered in the State of Washington, the contract was a Washington contract, and governed by the laws of that State and not by the laws of New York, *Equitable Life Assurance Society* v. *Clements*, 140 U. S. 226, 232; that the statement in the application signed by Phinney that it was made "subject

to the charter of the company and the laws of New York," by its terms refers only to the application, and does not make the laws of New York controlling in reference to the terms of the contract, which was evidenced by the policy subsequently issued ; and that being a Washington contract, and there being no legislation in that State in respect to matter of forfeiture, by its terms it became forfeited on the non-payment of the second annual premium.

On the other hand, it is contended by the executrix that, whatever may be the effect of the statute upon foreign companies which may happen to be doing business within the limits of New York, it is as to local companies practically a modification of their charters and a statutory rule thereafter controlling all contracts made by them, whether within or without the State ; that even if this be not true, yet, as the policy refers to the application and makes it a part of the contract, and as there is no law of New York which affects in any way an application as such, the statement therein, that it is made subject to the charter of the company and the laws of New York, must be understood as directly incorporating the laws of New York into the contract, or at least referring to them as containing the rules for its construction and enforcement; and also, inasmuch as by its terms, final performance (that is, the payment of the policy) is to be made in New York, the law of the place of performance is the law which governs as to the validity and interpretation of the contract. *Washington Central Bank* v. *Hume,* 128 U. S. 195 197, 206 ; *Coghlan* v. *South Carolina Railroad,* 142 U. S. 101, 109, and cases cited in the opinion.

We are not insensible of the importance as well as the difficulty of the question thus presented in these various aspects, but think that the case may properly be disposed of without any consideration or determination thereof.

We shall assume, without deciding, that the law of New York does control in respect to this contract, and still are of the opinion that the judgment must be reversed for error occurring on the trial, and error of such a character as in view of the testimony may render it unnecessary ever to consider the question to which we have referred. Confessedly, the insured did not pay

the annual premium due September 24, 1891, nor that due September 24, 1892, although he lived until September 12, 1893. It appears from the undisputed testimony that the insured knew when the premium became due in September, 1891. Twice he spoke to the local agent seeking to arrange for the payment of the premium by a note, and some three or four months thereafter he surrendered the policy to such agent. It is true that at the time of the surrender the agent told the insured that the policy was forfeited, or words to that effect, and that the insured said to him that as the policy had lapsed it was no good to him, and the agent might take it if he wanted it. But never thereafter until the time of his death, more than a year and a half, was anything done or said by the insured in respect to the policy; no suggestion of payment of premium or anything of any kind in respect to it. He treated the matter as abandoned, and gave up to the agent of the company the instrument by which the contract was evidenced. Further, after his death his widow, the plaintiff, filed an affidavit that the personal property of her husband's estate amounted only to $50,000, which, of course, was not true if she had a $100,000 policy in the defendant company. Not only that, she ignored the policy altogether for nearly ten months, although she promptly presented claims under other policies. As she testified that she knew of the existence of this policy her conduct is explainable only on the theory that she understood that, which the evidence affirms, her husband had abandoned the policy and surrendered it to the company. Upon these facts the defendant asked this instruction, which the court declined to give:

" If you find from the evidence in this case that the said Guy C. Phinney stated to the representative of the defendant in the State of Washington that he could not pay the premium falling due September 24, 1891, and that he did not pay nor tender the same, and that he thereafter surrendered said policy to the defendant's representative, they mutually believing and understanding that the same was of no force or validity then or thereafter, by reason of the non-payment of the said premium, this would constitute an abandonment and rescission of this contract by both parties thereto, and would put an end to the

same; and if you find the facts so to be, you must find a verdict for the defendant."

In lieu thereof the court charged as follows:

"Now, it is contended that Mr. Phinney and this company, acting through Mr. Stinson as its agent, arrived at an understanding and agreement that the policy should not continue longer in force; Phinney was to pay no more money, and that his rights and the policy were abrogated. Notwithstanding the provision of the statute of New York, that a provision in the policy itself waiving notice has no effect, and that the company can only forfeit the policy for non-payment of premium by mailing the prescribed notice, still it would be competent, and it was competent, for the parties mutually to agree to the cancellation of a life insurance policy if they saw fit to do so. And if the evidence in the case shows that Mr. Phinney did voluntarily, without being induced by any false representations or deceit to give up the policy, rescind the contract and give up the policy rather than to continue to pay the premiums provided for in the policy, that agreement would have the effect to terminate this policy so that it would no longer be a continuing contract. There is testimony in the case tending to prove that Mr. Phinney was unable to meet the second payment when it fell due, and by reason of his failure to make that payment, he voluntarily delivered up the policy to Mr. Stinson as an agent of the company, with the understanding, expressed at the time, that it was lapsed, that it was no longer a continuing contract in his favor. If there was a full and fair understanding between these two men in that matter, and they both treated it as an abrogated and annulled contract, and each relied upon that understanding, it would have the effect to terminate the policy, and the company would have the right to consider itself absolved from any obligation to give the statutory notice in order to forfeit the policy, because it would be unnecessary for the company to forfeit by legal proceedings what the opposite party had voluntarily relinquished. It is a question of fact, therefore, for you to determine from the evidence in the case, whether there was a full, complete understanding and meeting of minds between Mr. Phinney and Mr. Stinson, and such an

agreement and understanding entered into between them, whether the policy was surrendered and delivered up to Mr. Stinson, with an understanding, and whether relying upon that understanding the defendant company subsequently acted."

In view of the facts heretofore narrated, it is obvious not only that there was error in the action of the court in declining to give the instruction requested by the insurance company, and giving that which it did, but also that the error was material. The instruction given suggested a matter in respect to which there was no testimony, yet which, in view of other language in the charge, was quite sure to mislead. In reference to this matter of abandonment and rescission, the court in effect declared that it was binding, unless induced by false representation or deceit. There is not the slightest syllable in the testimony to suggest that the agent deceived the insured, nor that he made a false representation in the sense in which a false representation may avoid a contract. And yet, as the court had already ruled that the law of New York controlled, that there was no forfeiture until the notice prescribed by the statute of that State had been given, the jury must have understood that when the agent said that the policy had lapsed, he made a false representation, and, therefore, that the action of the insured, based upon that false representation, did not amount to an abandonment. But whether that statement of the agent was correct in matter of law is doubtful; whether true or false, or, more accurately, whether correct or not, in its interpretation of the law applicable to this contract, is immaterial. It was merely a statement of what he supposed the law was, and the insured was under the same obligations to know the law that the company, or its agent was. The jury evidently proceeded upon the supposition that the insurance company, located in New York, knew what the law of that State was; the insured, residing in Washington, did not, and when the agent stated what the condition of the contract was, he misrepresented the law of New York, of which the insured was ignorant, and, being ignorant, was not bound by any act based thereon in the way of abandonment or rescission. But surely no such rule as that obtains. When two par-

ties enter into a contract, and make it determinable by the law of another State, it is conclusively presumed that each of them knows the law in respect to which they make the contract. There is no presumption of ignorance on the one side and knowledge on the other. Reverse the situation. Suppose the insurance company had made this contract as a Washington contract, and there had been some peculiar provision of that State controlling all contracts made within the State: could the company, a corporation of New York, thereafter be permitted to say that it did not know what the law of Washington was; that the insured, as a resident of that State, must be presumed to have known it; that he did not communicate his information, and therefore it was not bound by that law, and that if he said anything in reference to it, it was a case of false representation or deceit? No one would contend this. And so when these two parties, the insurance company and the insured, dealing as we are now supposing in a contract which they mutually agree should be determinable by the laws of New York, it is an absolute presumption that each knew those laws, and that neither one could be misled by any statement in respect thereto on the part of the other. Whatever opinion either might express in reference to those statutes, was a mere matter of opinion. He was chargeable with knowledge, just exactly as the insurance company was. *Sturm* v. *Boker*, 150 U. S. 312, is decisive of this question. In that case the statement of the insured as to a question of law was insisted upon as conclusive, but this court said (p. 336):

"Both the defendants and the insurance companies had the written contracts before them, and were presumed, as a matter of law, to know their legal effect and operation. What the complainant said in his testimony was a statement of opinion upon a question of law, where the facts were equally well known to both parties. Such statements of opinion do not operate as an estoppel. If he had said, in express terms, that by that contract he was responsible for the loss, it would have been, under the circumstances, only the expression of opinion as to the law of the contract, and not a declaration or admission of a fact,

such as would estop him from subsequently taking a different position as to the true interpretation of the written instrument.

"In *Brant* v. *Virginia Coal & Iron Co.*, 93 U. S. 326, 337, it was said: 'Where the condition of the title is known to both parties, or both have the same means of ascertaining the truth, there can be no estoppel.'

"So in *Brewster* v. *Striker*, 2 N. Y. 19, and *Norton* v. *Coons*, 6 N. Y. 33, and approved in *Chatfield* v. *Simonson et al.*, 92 N. Y. 209, 218, where it was ruled 'that the assertion of a legal conclusion, where the facts were all stated, did not operate as an estoppel upon the party making such assertion.'"

So, whatever the local agent may have said as to the condition of the contract, was a mere expression of opinion as to a matter of law in respect to which both parties were equally chargeable with knowledge. It seems to us clear that only because of the inference to be drawn from the rejection of the instruction asked by the defendant, and the giving of the instruction with this suggestion of false representation or deceit, can the verdict of the jury be accounted for.

Nor can we think that the action of the defendant in requesting, after the jury had returned and asked certain questions, which were answered by the trial judge, that he repeat the instructions theretofore given in respect to waiver and abandonment, is to be taken as an indorsement of those instructions. After it had once excepted to the refusal of an instruction which it had asked, and excepted to those that were given, it did not lose the benefit of such exceptions by a request that the court repeat the instructions excepted to in connection with certain answers made to questions propounded by the jury. It meant simply that if the court answered, as it did, the questions propounded by the jury, it ought to supplement those answers with a restatement of the instructions theretofore given, and asking that restatement was not an admission that they were correct, but simply a request that they should be restated so as to qualify the answers given to the questions.

In this connection we may be permitted to suggest that no afterthought of ingenious and able counsel should be permitted to disturb the understanding and agreement of the parties based

upon their belief as to what the law is, or to enforce a contract which both parties concluded to abandon.

A single further matter requires notice, and we mention it simply to indicate that we have considered, although we do not decide, the question involved therein: The contract of insurance is a peculiar contract, especially when made with a mutual insurance company, for although in terms a contract with a corporation it is in substance a contract between the insured and all other members of that company. The character of this contract was fully considered and discussed by this court in *New York Life Insurance Co.* v. *Statham,* 93 U. S. 24, and to that case we refer without quotation. Now, whether the insurance company, if the law of New York be applicable, could insist upon a forfeiture without giving the notice prescribed by the statutes of that State, and, enforcing it, forfeit all premiums paid, all obligation for the return of the surrender value, all right of the insured by subsequent payments to continue the policy in force, is one question. But it is a very different question whether the executrix of the insured, after his long delinquency in the payment of premiums, can enforce the contract as against the other insured parties, thereby diminishing their interest in the accumulated reserve. Ordinarily no one can enforce a contract unless on his part he performs the stipulated promise, and it may be that this rule is operative in this case. We do not care to decide the question, and only mention it for fear that it should be assumed we had overlooked it. It is a question which may never arise in the future litigation of this case, and until it necessarily arises we do not feel called upon to decide it.

> *For these reasons the judgments of the Court of Appeals of the Ninth Circuit and of the Circuit Court of the United States for the District of Washington are reversed, and the case remanded to the latter court with instructions to award a new trial.*

Mr. Justice Peckham did not sit at the hearing and took no part in the decision of this case.