NELSON v. REPUBLIC IRON & STEEL CO. et al.

(Circuit Court of Appeals, Eighth Circuit. February 22, 1917.)

No. 4674.

1. COURTS ⊝➝366(14)—FEDERAL COURTS—MINING LEASE—WHAT LAW GOVERNS.
   A Minnesota mining lease is governed by the law of that state, and in construing such lease the federal courts must follow the decisions of the state courts.

2. MINES AND MINERALS ⊝➝56—MINING LEASES—CONSTRUCTION.
   Under the Minnesota doctrine, a mining lease is not a sale of the ore, and the royalties reserved the purchase price; but the contract is one of lease as designated, and the amount stipulated to be paid by the lessee is rents, which is the compensation the occupier pays for the land for that species of occupation which the contract allows.
   [Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. § 166.]

3. MINES AND MINERALS ⊝➝70(2)—MINING LEASES—CONSTRUCTION.
   A mining lease, having provided for payment of royalty for every ton of ore mined, declared that within one year from the completion of a railroad within four miles of the land there should be mined at least 10,000 tons of ore per annum, and, in case the lessee should fail to remove the 10,000 tons specified, the lessee should pay to the lessor the royalty on that number of tons. The contract further declared that, if the lessees desired to keep the lease in force beyond a fixed day, they should pay to the lessor $1,000, which, together with the $1,000 paid upon the execution of the lease, should apply on the first royalty due. Held that, in view of the provision for application of the initial payments on royalties to become due, payments of the minimum stipulated royalty where no ore was mined cannot be applied on ore subsequently removed.
   [Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. § 193.]

4. MINES AND MINERALS ⊝➝70(2)—CONTRACT—CONSTRUCTION.
   Where a mining lease providing for payment of royalty on a minimum tonnage of ore, though it was not mined, made no provision for the application of such minimum royalties on ore thereafter mined, receipts signed by the owner, reciting that he had received the full royalty or rent, and others of which used the terms "royalty," "advance royalties," or "rents"

⊝➝For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

indiscriminately, do not show a practical construction by the lessor that such minimum royalties might be applied on ore subsequently mined; the question of the construction of the contract, though in the minds of the lessee preparing the receipts, not being communicated to the lessor.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. § 193.]

5. MINES AND MINERALS ☞62(1)—MINING LEASES—PRACTICAL CONSTRUCTION.

A practical construction by a lessor is not binding where the mining lease construed was plain and unambiguous.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. §§ 175–180.]

6. MINES AND MINERALS ☞70(2)—MINING LEASES—CONSTRUCTION—ESTOPPEL.

The lessor of mining property whose lease provided for the payment of royalty on a minimum number of tons regardless of the number mined, at the request of one interested in the lease, executed an instrument reciting the amount of the payments of advance royalties by the several parties in interest. There were conflicting interests among the lessees, and it was claimed that the lessor had been overpaid. The instrument which was in the form of a receipt was prepared by one of those interested in the lease who had also acted as attorney for the lessor in other matters. It appeared that lessor had executed other mining leases which provided that payment of advance royalties should be applied on ore subsequently mined. The receipt was prepared as an attempt to secure a construction by the lessor as to whether payments of minimum royalties might be applied on ore subsequently mined, but that matter was not called to his attention. *Held*, that the lessor was not estopped from denying that such payments could not be applied to ore subsequently mined; for, where the statement or conduct is not resolvable into a statement of fact, the party making it is not bound, unless he was guilty of clear moral fraud, or unless he stood in a relation of confidence towards the one to whom it was made.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. § 193.]

7. ESTOPPEL ☞84—EQUITABLE ESTOPPEL—WRITTEN INSTRUMENT.

A mere statement by a mining lessor of opinion as to law governing the lease, which was not a declaration or admission of fact, will not estop him as to one subsequently acquiring the lease from taking a different position as to the true interpretation.

[Ed. Note.—For other cases, see Estoppel, Cent. Dig. § 219.]

Appeal from the District Court of the United States for the District of Minnesota; Page Morris, Judge.

Suit by the Republic Iron & Steel Company against Benjamin F. Nelson and others. From a judgment for plaintiff, the named defendant appeals. Reversed and remanded, with directions.

March 18, 1893, the appellant, with others, made to one Azro T. Crossley and others a mining lease on 40 acres of land in Itasca county, Minn., for the term of 50 years from and after the 1st day of April, 1893. The indenture evidencing the "contract, lease and demise" of said premises contained the following provisions which are or may be deemed pertinent in the determination of this case:

"Which premises are leased to the parties of the second part for the purposes of exploring for, mining, taking out and removing therefrom, the merchantable shipping iron ore which is, or which hereafter may be, found in or under said land, together with the right to construct all buildings, make all excavations, openings, ditches, drains, railroads, wagon roads, and other improvements upon said premises which are (—) may become necessary or suitable for the mining or removal of iron ore from said premises, with the right, during the existence of this lease, to cut and use the timber found upon the said premises for fuel, and so far also as may be necessary for the construction of build-

ings required in the operation of any mine or mines on the premises hereby leased, as also the timber necessary for drains, tramway and supports for such mine or mines.

"The party of the first part further agrees that the parties of the second part shall have the right under this agreement to contract with others to work such mine or mines, or any part thereof, or to sub-contract the same, and the use of said land, or any part thereof, for the purpose of mining for iron ore, with the same rights and privileges as are herein granted to the said parties of the second part. The parties of the second part, in consideration of the premises, hereby covenant and agree to and with the parties of the first part, that the parties of the second part will, on or before the twentieth day of April, 1894, July, 1894, October, 1894, and January, 1895, and at the same times in each year after said 1894, during the period hereinbefore stipulated, or during the period this contract continues in force, pay to the said Benjamin F. Nelson for all the iron ore mined and removed from the said land during the three months preceding the first day of the month in which payment is to be made, as aforesaid, at the rate of twenty-five (25) cents per ton, for all iron ore taken out, mined and carried away, each ton to be reckoned at twenty-two hundred and forty (2,240) pounds.

"The parties of the second part further covenant that within one (1) year from the completion of a railroad within four (4) miles of said land, there shall be mined and removed therefrom at least ten thousand (10,000) tons of iron ore, and at least ten thousand (10,000) tons shall be annually thereafter mined and removed therefrom, and in case the said parties of the second part shall not annually remove from the said land the ten thousand tons of ore as above stipulated, the parties of the second part shall pay to said B. F. Nelson a royalty of twenty-five cents per ton on ten thousand tons, which payment shall be made quarterly, as above specified.

"Provided further, that if second parties wish to keep this lease in force after October 1, 1893, they shall on that date pay to said first parties (1,000.00) one thousand and $00/100$ dollars, which, together with the (1,000.00) one thousand & $00/100$ dollars paid upon the execution of this lease shall apply on the first royalty due under it; failure to pay said (1,000.00) one thousand & $00/100$ dollars on October 1, 1893, shall make this lease void. And it is agreed that the date at which royalties shall commence shall not be earlier than January 1, 1894.

"It is mutually understood and agreed that upon the termination of this agreement, whether by the acts of the parties, or either of them or by limitation, the parties of the second part shall have ninety (90) days in which to remove all engines, tools, machinery, railroad tracks and structures erected or placed by said parties on said land but shall not remove or impair any supports placed in the mines, nor any timbers or frame work necessary to the use and maintenance of shafts or other approaches to the mines or tramways within the mines.

"The parties of the second part shall open, use and work the said mines in such manner only as is usual and customary in the skillful and proper mining operations of similar character when conducted by the proprietors themselves on their own lands, and so as not to do, cause or permit any unnecessary or unusual permanent injury to the same, or inconvenience or hindrance in the subsequent operating of the said mine, and in the working of said mines, the parties of the second part shall deposit all earth, rock and other useless material or rubbish at such places and in such manner as will not conflict with or embarrass the future operating of said mines."

In 1902 appellee Charles A. Smith had acquired the rights of the lessees under this lease. It appears to be conceded, as stated in appellant's brief, that at that time no ore had been removed from the land, and no payments had been made by the lessees except the two payments of $1,000 each, one when the lease was executed and one on Octobr 1, 1893; that the lessees claimed that other payments were not due because a railroad had not yet been completed to within four miles of the land; the lessor claiming that such a railroad had been built. June 2, 1902, a supplemental agreement was entered into between the lessors and Smith in which the following provision appears:

"The first parties also agree that they have not now any claim or demand for rent of said premises or for royalty and will not make any claim for rent of said premises or royalty for the period during which the second party is permitted under this agreement to explore said premises. The first parties further give the second party until July 1, 1903, in which to explore the said premises upon the terms and conditions provided for in said lease."

June 29, 1903, pursuant to the terms of the latter agreement, Mr. Smith wrote appellant as follows:

"I have so far completed the exploration thereof that I am satisfied there is a mine of merchantable iron ore on said piece or parcel of land. I respectfully notify you that I shall begin to make payments of royalties from and after July 1, 1903.  *  *  *  I further respectfully notify you that I claim as a credit upon the first royalties due under said lease from and after July 1st, 1903, the sum of two thousand dollars heretofore paid upon said lease pursuant to the terms thereof."

It appears further that on July 11, 1904, appellees Blue Ore Mining Company and Fred B. Snyder had acquired from appellee Smith an interest in said lease, and payments were then made on account of minimum royalties provided by the terms thereof. There was at that time a dispute between said Blue Ore Mining Company and Snyder as to the ownership of one-twentieth of the mine. Each claimant, to preserve his rights, for a short time paid a proportionate part of the royalty on the interest in the mine claimed by him. This resulted in overpayments.

Again, in 1906, the Paxton Mining Company, a corporation, claimed to have acquired this lease, and a dispute which had arisen between that company on the one hand, and the Blue Ore Mining Company, Smith, and Snyder on the other, over the title to the leasehold, led to litigation. While this was pending, in 1906 and 1907, all parties paid royalties according to their respective claims, and again double payments resulted, for which the proper party or parties must eventualy be entitled to refund. These disputes over the title culminated in an adjustment which was tentatively agreed upon on August 8 and 9, 1907, and consummated August 17, 1907. By this adjustment appellees Blue Ore Mining Company, Charles A. Smith, and Fred B. Snyder sublet the premises to the Paxton Mining Company, which, in turn, on August 19, 1907, assigned this sublease to the Republic Iron & Steel Company. Appellant was not a party to these proceedings, but knew generally of the negotiations pending and of their final consummation. In the sublease to the Paxton Mining Company the Blue Ore Mining Company covenanted that it had caused to be paid to the lessors, as advanced royalty, the sum of $5,000, and that under the terms of the lease it was then entitled to mine and remove, without any further payment therefor, iron ore when mined, in excess of the minimum therein provided for, to the amount of 20,000 tons by reason of such payment. Appellees Smith and Snyder made a similar covenant covering payments of $4,431.25, and the right to mine and remove 17,725 tons of iron ore without further payment therefor—all of which rights were thereby transferred to said Paxton Mining Company. The latter company had, itself, paid minimum royalties finally computed as amounting to about $3,125. Those paid by Smith and Snyder were likewise ultimately reduced to $4,375.

At the time the foregoing transaction was formulated and closed, it was understood by all the parties thereto that appellee Republic Iron & Steel Company was to purchase this leasehold from the Paxton Mining Company, and, among other considerations, was to pay the latter company a bonus of $200,-000, and also repay to the respective parties who had paid the same the minimum royalties aggregating $12,500 as aforesaid.

After the assignment of the lease to it, the Republic Iron & Steel Company continued to make payments to appellant, before any iron ore was removed from the mine, at the rate of $625 per quarter, as provided by the lease, until July 1, 1909, amounting to $4,375. Thereafter, when ore was mined and removed from said land by the Republic Iron & Steel Company, that company undertook to apply a portion of the royalty theretofore paid to the payment of royalty upon the ore so mined and removed, claiming the former to be advance

royalty and subject to such application. Appellant objected thereto, and demanded that the Republic Iron & Steel Company pay royalty at the rate prescribed in the lease for all ore mined and removed in each quarter year, without making any allowance for or deduction on account of royalties already paid by that company and its predecessors in interest, and threatened that, unless payment was made to him in accordance with said demand, he would declare a forfeiture of the lease under its provisions. Accordingly, this suit was brought by the Republic Iron & Steel Company against appellant, the Paxton Mining Company, the Blue Ore Mining Company, Charles A. Smith, and Fred B. Snyder as defendants, to restrain appellant from refusing to allow the application of any royalty, paid under the minimum requirements of said lease in excess of ore mined and removed, upon ore thereafter mined and removed in any quarter year in excess of the minimum requirements of said lease, and from threatening or attempting to enforce a forfeiture of said lease by reason of any such application; further, for the recovery of all sums so paid to him in excess of that to which he is entitled under the terms of said lease, if any such be found, and further that the decree entered herein shall be binding upon the other defendants in the event of the court holding that the plaintiff is not entitled, as against appellant, to apply the sum of $12,500 repaid to him by the Republic Iron & Steel Company. All the other defendants, by their answers, made common cause with complainant, claiming that under a proper construction of the lease in question all payments, made as minimum royalties before the removal of ore, should thereafter be applied as part of the purchase price of ore actually removed. They further claim that, by the form of the receipts accepted, the defendant Nelson had made a practical construction of the lease to the same effect; that by a statement known as Exhibit V, made by appellant during the progress of the negotiations resulting in the sublease to the Paxton Mining Company and its subsequent assignment to the Republic Iron & Steel Company, appellant is estopped from asserting any absolute claim to such payments for minimum royalties, and has waived any rights which he might otherwise have had. Appellant therefore appears as the real and substantial defendant in the controversy. The court found the issues in favor of the plaintiff Republic Iron & Steel Company, holding:

"That by the true construction of said lease, as shown by the evidence in this case, and, especially, by the construction placed thereon by the parties thereto and their successors in interest until the month of October, 1909, all amounts paid by the lessees, as royalty on ore, in advance of the mining thereof, under said provision requiring the mining and removal of 10,000 tons annually, or the payment of a royalty thereon if not mined and removed, were to be treated as the payment of advanced royalty on ore thereafter to be mined, and the lessees had the right to mine and remove an amount of ore equal to that upon which such advanced royalty had been paid, without further payment therefor, in any year after the full amount of 10,000 tons had been mined and removed from the land."

And further:

"That defendant Nelson is now estopped, as to all the other parties to this action, from claiming any other construction or meaning therefor."

David F. Simpson, of Minneapolis, Minn. (William A. Lancaster and Milton D. Purdy, both of Minneapolis, Minn., on the brief), for appellant.

Oscar Mitchell, of Duluth, Minn. (J. L. Washburn, W. D. Bailey, and A. C. Gillette, all of Duluth, Minn., and O. T. Fell, of Pittsburgh, Pa., on the brief), for appellee Republic Iron & Steel Co.

Fred B. Snyder, of Minneapolis, Minn., for appellees Snyder and Smith.

Before SANBORN and CARLAND, Circuit Judges, and VAN VALKENBURGH, District Judge.

VAN VALKENBURGH, District Judge (after stating the facts as above). The issues presented for determination are thus defined by the various parties:

As stated by appellant:

"The single question presented by this appeal is: 'Can the stipulated payments under a mining lease, made in advance of ore being removed, be applied on ore subsequently removed, in the absence of any provision for such application and contrary to the express requirements of the lease?'"

Counsel for Republic Iron & Steel Company say:

"The issue to be determined on this appeal is whether the minimum payments made, under the mining lease in question, in advance of mining ore, are to be treated as 'advance royalty', or as 'dead rent.'"

Appellee Snyder, for himself and appellee Smith, puts it thus:

"Can payments of 'royalty' made, under the terms of the Nelson indenture, in advance of ore being mined and removed, be applied on ore subsequently removed in excess of minimum requirements? If this question is answered in the affirmative, appellant's appeal must fail. If in the negative, it must be sustained unless the appellant has, as to these appellees, either: (a) Lost his rights by a practical construction of the contract; or (b) suffered an estoppel; or (c) waived his rights."

By common consent, then, we turn first to consideration of the controlling clauses of this indenture. It will be noted that they contain no language expressly authorizing or permitting payments of royalty, required to be made in advance of ore being mined and removed, to be applied on ore subsequently removed in excess of minimum requirements. If, then, the right exists, it must be by implication, and must flow from the necessary legal effect of the terms employed.

[1, 2] Appellees base their contention primarily upon the nature of the estate created by an instrument of this sort. They insist that, by the grant, the lessees were made the owners of the ore; that the lease is in reality a sale of the ore, and the royalties reserved are, in fact, the purchase price of it. It is therefore argued that the right to apply such royalties, previously paid, to ore subsequently mined and removed, results naturally and necessarily from the character of the transaction. Authorities conceived to be in support of this theory are cited; among them, Diamond Iron Mining Co. v. Buckeye Iron Mining Co., 70 Minn. 500, 73 N. W. 507; Muhlenberg v. Henning, 116 Pa. 138, 9 Atl. 144; Plummer et al. v. Hillside Coal & Iron Co., 104 Fed. 208, 43 C. C. A. 490; Wilmore Coal Co. v. Brown (C. C.) 147 Fed. 931; In re McFadden's Estate, 224 Pa. 443, 73 Atl. 927; Von Baumbach v. Sargent Land Co., 219 Fed. 31, 134 C. C. A. 649.

Appellant relies upon the doctrine announced in Minnesota, supported by decided cases in other jurisdictions, that under these mining leases the amounts stipulated to be paid by the lessees are rents and not the purchase price of mineral in place; that they are "the compensation which the occupier pays the landlord for that species of occupation which the contract between them allows"—citing State v. Evans, 99 Minn. 220, 108 N. W. 958, 9 Ann. Cas. 520; Boeing et al. v. Owsley, 122 Minn. 190, 142 N. W. 129; State v. Royal Mineral Ass'n, 132 Minn. 232, 156 N. W. 128; Saulsberry v. Saulsberry, 162 Ky.

486, 172 S. W. 932, Ann. Cas. 1916E, 1223; Kissick et al. v. Bolton et al., 134 Iowa, 650, 112 N. W. 95; Lehigh Zinc & Iron Co. v. Bamford, 150 U. S. 665, 14 Sup. Ct. 219, 37 L. Ed. 1215; Wonsetler et al. v. Andrews et al., 58 Ohio, 551, 51 N. E. 168; Woodruff v. Gunton, 222 Pa. 384, 71 Atl. 851; Gilmore v. Ontario Iron Co., 86 N. Y. 455; Berwind-White Coal Min. Co. v. Martin, 124 Fed. 313, 60 C. C. A. 27.

Of course, in the elaborate briefs of counsel on both sides, many cases other than those above selected are deemed to bear more or less directly upon this point in issue; but the foregoing are thought to be sufficiently comprehensive fully to disclose the divergent theories. The Minnesota rule must be conceded to be as claimed by appellant. The Supreme Court of that state holds that instruments called and operating as mining leases "are leases in fact as well as in name, and the amount stipulated to be paid by the lessees are rents." This doctrine, first suggested in State v. Evans, supra, was approved in Boeing v. Owsley, and expressly confirmed in the very late case of State v. Royal Mineral Ass'n after full consideration of previous decisions in various jurisdictions, both state and federal. The court said:

"We adhere to the doctrine of the Evans and Boeing Cases, and hold these instruments leases. It follows logically that the amounts stipulated to be paid by the lessees are rents, and they were expressly held by this court to be rents in the Boeing Case, supra, a case which involved a construction of the very leases now before the court. They are 'the compensation which the occupier pays the landlord for that species of occupation which the contract between them allows.'"

This is a Minnesota contract, and, as between private parties, it is our duty to follow the decisions of the Minnesota court of last resort establishing a rule of property in that jurisdiction. Kuhn v. Fairmont Coal Co., 215 U. S. 349–360, 30 Sup. Ct. 140, 54 L. Ed. 228; Wilmore v. Brown (C. C.) 147 Fed. 931; Polk et al. v. Mutual Reserve Fund Life Ass'n et al. (C. C.) 137 Fed. 273; Smith et al. v. Guffey et al., 202 Fed. 106, 120 C. C. A. 436. This being so, it is unnecessary to attempt a reconciliation of conflicting decisions in other jurisdictions. In Von Baumbach v. Sargent Land Co., supra, this court was construing a federal statute in a case between the government and a private corporation. Here, we have under consideration a Minnesota contract between private parties affecting property rights in that state, and in such case we are bound by the construction placed upon it by the local courts. Von Baumbach v. Sargent Land Co., 242 U. S. 503, 37 Sup. Ct. 201, 61 L. Ed. ——.

[3] It is obvious then that the claim of appellees is not sustained by the nature of the estate created by the lease in question. Are its terms susceptible of the interpretation for which they contend? We do not think so. It provides clearly and without ambiguity for a minimum annual payment within one year from the completion of a railroad within four miles of said land, irrespective of the mining and removal of ore during that year and unconditioned thereby. The fact that this annual payment is computed as royalty upon a required minimum production of 10,000 tons of iron ore does not change the nature of the transaction. The provision is for an annual minimum compensation "for that species of occupation which the contract between

them allows." Such a provision is not unusual in such leases. It is inserted to insure diligence and promptitude in mining. Diamond Iron Mining Co. v. Buckeye Iron Mining Co., 70 Minn. 500–505, 73 N. W. 507; Lehigh Valley Coal Co. v. Everhart, 206 Pa. 118–124, 55 Atl. 864; Gilmore v. Ontario Iron Co., 86 N. Y. 455.

The decided cases do not support the contention of appellees that the right of future application is implied from the nature of the transaction in the absence of provision in the lease itself authorizing or permitting such application. On the contrary, it appears from the record that in a majority of leases such authority is expressly given. As was said in Wonsetler et al. v. Andrews et al., 58 Ohio St. 551–557, 51 N. E. 168, 169, 170:

"The omission of such stipulation in the instrument under consideration would indicate that a different result was intended by the parties in this case. A stipulation of so material a character should not be supplied by construction."

It will also be noted that the lease in terms provided that the $2,-000, to be paid at its execution and to keep it in force after October 1, 1893, should apply on the first royalty due under it; thereby, under ordinary rules of construction, excluding a like application of other payments in advance of mining. Furthermore, in his notification of June 29, 1903, appellee Smith claims credit for such sum upon first royalties due, but makes no similar claim for minimum royalties to be paid after July 1, 1903, although he makes express reference to the date when payment of such royalties should begin. These circumstances are not without their logical significance. We have given careful consideration to all points raised in argument and brief bearing upon the construction of this instrument, and nothing has been adduced which tends to disturb the conclusion we have reached.

[4] But it is insisted that, even though under the terms of the lease these payments in advance of ore being mined and removed cannot be applied on ore subsequently removed in excess of minimum requirements, nevertheless appellant has lost his rights by a practical construction of the contract. This contention is based upon the terms of certain receipts given by appellant at the times the minimum royalty payments were made. As stated in argument and brief, the first receipts were carefully drawn by appellee Smith. That dated July 11, 1904, stated that the payments made were for and on account of "advanced royalty or rent" due under the lease. The following clause also appears:

"With this payment I have received on account of said lease the sum of twenty-five hundred and twenty-five dollars ($2,525), being the royalty or rent in full on said lease for the year ending July 1, 1904, and twenty-five dollars ($25) additional, which said sum of $25.00 I hold in trust for whoever may be rightly entitled thereto."

Other receipts and letters used the terms "advanced royalties," and still others, "advance royalties or rent." In others, we find the terms "royalty," "royalties," "royalty on mining lease," "advance rent or royalty due on lease," and "amount due on Nelson lease." Those receipts, upon which special emphasis is placed, were drawn by the ap-

pellee Snyder; a few of the others were drawn by appellant. In the latter, the term "advanced royalties," does not appear; where it does appear, it is more often used in the disjunctive with the word "rent." Appellant himself uses the words "royalty" or "royalties" and "rent" apparently without distinction. In mining leases, these words "rent" and "royalty" are used interchangeably to convey the same meaning. Saulsberry v. Saulsberry, 162 Ky. 486, 172 S. W. 932, Ann. Cas. 1916E, 1223; 27 Cyc. 710. Taking the receipts as a whole, it is obvious that no uniformity in phraseology was attempted. Appellant states that when he signed these receipts he had not in mind any distinction between the different phrases used, and did not suppose that any of them had any effect upon the terms of the lease; that at the time they were given there was and had been no discussion as to whether royalties paid could be applied on ore subsequently taken out. We do not think these receipts, under their terms, or under the circumstances of their issuance and acceptance, make out a case of practical construction unfavorable to appellant. He gave them, as payments were made, without thought that they could operate, or were intended to operate, to change the terms of the lease. Many, perhaps most of them, could have no such effect. It is urged that appellee Snyder carefully prepared those first given for the purpose of determining whether they would meet with objection from Mr. Nelson, and therefore of eliciting from him a casual interpretation of the terms of the lease. He did not, however, in his communications, nor in the terms of the receipts themselves, frankly call attention to the question in his mind, nor use expressions which could be presumed to challenge the attention of the lessor. It devolved upon him and his associates to satisfy themselves of the legal effect of this indenture at the time they acquired their interest in it. The plain intendment of the terms of a written instrument is not lightly to be set aside through indirection and inadvertence.

[5] There is another reason why this contention of appellees must fail.

"It is only where there is doubt as to the meaning of the terms used, or the writing is silent or incomplete as to a given point, that the courts in interpreting the contract will resort to a practical construction which the parties may have put upon it." St. Paul & Duluth R. Co. v. Blackmar, 44 Minn. 514–518, 47 N. W. 172; Coal Creek, etc., Co. v. Tennessee Coal, etc., Co., 106 Tenn. 651–687, 62 S. W. 162; Twin Tree Lumber Co. v. Ensign et al., 193 Ala. 113, 69 South. 525; Tustin v. Philadelphia & R. C. & I. Co., 250 Pa. 425, 95 Atl. 595; Railroad Co. v. Trimble, 10 Wall. 367–377, 19 L. Ed. 948; Barber Asphalt Paving Co. v. City of St. Paul, 224 Fed. 842, 138 C. C. A. 558.

The contract under consideration is clear, complete, and unambiguous. In such case, the mere opinion of either party as to its meaning cannot control, nor was appellant required, before receipting for payments made under it, to guard against an inadvertent misconception of its plain and unequivocal terms.

[6] As has been heretofore stated, in the sublease to the Paxton Mining Company, appellees Blue Ore Mining Company, Smith, and Snyder covenanted that they had paid to appellant the sums therein mentioned as advance royalty under the terms of said lease, and to

that extent were entitled to mine and remove ore without further payment therefor. This right was transferred to the Paxton Company, and by it to appellee Republic Iron & Steel Company, which ultimately paid to the Blue Ore Mining Company, the Paxton Mining Company, and•Smith and Snyder the amounts so paid by them as alleged advance royalties. After the instruments evidencing these transactions had been formulated and executed, but before the final transfers had been made, appellee Snyder, with his attorney Lind, who also represented appellee Smith, visited appellant for the purpose of getting a statement of all the moneys theretofore paid by the various parties in interest as minimum royalties in advance of the mining and removing of ore. This visit resulted in the execution by appellant of an instrument known as "Exhibit V," which, omitting the attached statement of amounts, reads as follows:

"This will certify, that I have received prior to this date, as advance royalties to apply on iron ore mined from the southeast quarter (S. E. ¼) of the southwest quarter (S. W. ¼) of section twenty-three (23), township fifty-seven (57), range twenty-two (22), under the lease now outstanding thereon, the several sums of money specifically set forth in the statement hereto attached, aggregating $12,500.00, of which the Paxton Iron Mining Company has paid $3,125.00, the Blue Ore Mining Company has paid $5,000, and Charles A. Smith and Fred B. Snyder jointly have paid $4,375.00. (C. A. S. $3,500.— F. B. S $875)

"Dated August 9th, 1907.                                    B. F. Nelson.
"Checked & correct.   F. B. S."

Appellees claim that this was a specific representation by appellant that the prior payments now in suit were advance royalties which they are entitled to apply on ore subsequently mined; that the sublease to the Paxton Company and the assignment thereof to the Republic Company were finally made and consummated upon the faith of this representation; and therefore that appellant is now estopped to place any different construction upon the terms of the lease.

It has alreeady been stated that because of controversies between the Blue Ore Mining Company and Smith and Snyder at one time, and between the Blue Ore Mining Company, Smith, and Snyder, and the Paxton Mining Company at another time, as to their respective interests in the lease in question, certain admitted overpayments, or rather duplicate payments, had been made to appellant. There was at all times between these parties, until the statement of amounts contained in Exhibit V, a dispute as to the precise amount which each of the above-named parties had paid. For this reason, it was desirable that an exact statement of these amounts should be procured from appellant. Appellant and his bookkeeper say that this was the only subject-matter in mind when this statement was applied for by Snyder and Lind. The latter say that their object was to get from appellant an expression of his construction of the terms of the lease on the right of application of these payments to ore subsequently mined; that they told him that the Republic Company was about to become a purchaser and to repay these sums on the theory that these rights existed. The testimony of Lind and Snyder does not satisfactorily reveal that such a purpose was disclosed to appellant. The terms of the lease were

not referred to in these discussions, nor was it brought home to appellant that a construction of those terms on his part was sought. He says he read the statement contained in Exhibit V and was aware of the import of its language, but that he owned at least one other lease, in the making of which appellee Snyder had acted as his attorney, and in which the right of future application of previous payments had been expressly reserved. No examination of any lease was made at the time this statement was indorsed as checked by appellee Snyder, in whom he had confidence, and he took it for granted that it followed the provisions of the lease then under consideration. Under these circumstances, this transaction is altogether analogous to those heretofore considered, involving a claimed practical construction by implication from the language of receipts. Not satisfied with the legal effect of the receipts theretofore given, appellees again sought, through Exhibit V, to obtain from appellant another expression of opinion as to the meaning of the written instrument. In our judgment, the effort must fail for practically the same reasons heretofore assigned.

"Where the statement or conduct is not resolvable into a statement of fact, as distinguished from a statement of opinion or of law, and does not amount to a contract, the party making it is not bound, unless he was guilty of clear moral fraud, or unless he stood in a relation of confidence towards him to whom it was made." Michie's Encyclopedia of U. S. Sup. Ct. Rep. vol. 5, p. 948; Sturm v. Boker, 150 U. S. 312, 14 Sup. Ct. 99, 37 L. Ed. 1093; Mutual Life Ins. Co. v. Phinney, 178 U. S. 327-342, 20 Sup. Ct. 906, 44 L. Ed. 1088.

Especially is this true where the parties have the written contracts before them, and are presumed, as a matter of law, to know their legal effect and operation. In these negotiations all the appellees were represented by lawyers of exceptional ability, especially conversant with mining leases; all were admittedly familiar with the lease in question and keenly alive to the provisions concerning royalty payments. They were presumed to know the legal effect of those provisions; that they did know it is evidenced by the activity displayed in seeking to elicit from appellant an expression of opinion or construction favorable to them. Their opportunity for full and complete understanding of the law and facts involved was certainly equal to, if not greater than, that of appellant. They were not deceived nor induced to rely upon admissions or representations concerning unfamiliar matters. Appellant was a layman of complex business affairs. His conduct discloses no suggestion of moral fraud. He may very well have labored under a misapprehension of the terms of this particular lease, to which his attention was in no wise especially directed. At the most, his statement amounted to a mere expression of opinion as to the legal effect of clauses which appellees and their counsel knew as well as or better than he did. The essential elements of estoppel are not present. The appellant clearly had no intention of relinquishing any of his substantive rights, nor did his acts, under the circumstances disclosed by the record, have that legal effect. The foregoing considerations dispose of the claim of waiver as well as that of estoppel.

[7] All the appellees, except the Republic Iron & Steel Company, find themselves in no worse position than that originally occupied by

them. . The latter company is conceded to have its remedy against its grantors for payments made to them. As to subsequent payments to appellant made by the latter company, it could not, in any event, rely upon a mere statement of opinion as to the law of a contract, not a declaration or admission of fact, to such extent as to estop appellant from subsequently taking a different position as to the true interpretation of the written instrument. Sturm v. Boker, and Mutual Life Ins. Co. v. Phinney, supra.

Inasmuch as all the parties in interest are in court, and their several rights and obligations have been made clearly to appear, the finding should be for the defendants Benjamin F. Nelson and Mary Nelson, and the plaintiff should have and recover from the other defendants such sums as may be found due upon the record under the issues framed. Costs will be taxed under the principles, rules, and practice in equity.

The decree of the court below will be reversed, and the cause remanded for further proceedings in accordance with the views expressed in this opinion. It is so ordered.